# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
TUPOUTOE MATAELE,
Defendant and Appellant.

S138052

Orange County Superior Court
00NF1347

July 21, 2022

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Groban, Jenkins, and Guerrero concurred.

Justice Groban filed a concurring opinion.

Justice Liu filed a concurring and dissenting opinion, in which Justice Kruger concurred.

PEOPLE v. MATAELE

S138052

Opinion of the Court by Cantil-Sakauye, C. J.

A jury convicted defendant Tupoutoe Mataele of the murder of Danell Johnson, the attempted murder of John Masubayashi, and conspiracy to commit the murders of Johnson and Masubayashi. (Pen. Code, §§ 187, subd. (a), 664, subd. (a), 182, subd. (a).)[1] The jury found true a special circumstance allegation that defendant committed the murder while lying in wait. (§ 190.2, former subd. (a)(15).) The jury also found true an allegation that defendant was armed with and personally used a firearm in the commission of each offense. (§§ 12022, subd. (a)(1), 12022.5, subd. (a).) Allegations that defendant suffered a prior strike conviction and a prior serious felony conviction were found true. (§§ 667, subd. (a), 1170.12, subds. (a)–(d).)

Following a penalty trial, the jury returned a verdict of death. The trial court denied defendant's motions to set aside the death verdict and for a new trial, and sentenced defendant to death. It also sentenced him to a life term plus nine years for the attempted murder count, the firearm enhancements, and the prior serious felony conviction. The court stayed the sentence on the conspiracy count pursuant to section 654. This appeal is automatic. (§ 1239, subd. (b).)

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

We affirm the judgment in its entirety. We also remand the matter for the limited purpose of allowing the trial court to consider whether to exercise its newly conferred discretion under Senate Bill No. 620 (2017–2018 Reg. Sess.) and Senate Bill No. 1393 (2017–2018 Reg. Sess.) to strike the firearm and prior serious felony enhancements, respectively.

## I. BACKGROUND

### A. Guilt Phase Evidence

#### 1. Prosecution evidence

Defendant participated in a criminal enterprise with numerous individuals. Although the initial enterprise was an ongoing identity theft and bank fraud scheme, later the venture included the purchase and sale of methamphetamine. Peter Song managed the group, which also included Johnson, Masubayashi, Minh Nghia Lee, James Chung, Ryan Carrillo, David Song, and Tweeney Mataele (defendant's brother, nicknamed "Baby"). At one point, nearly the entire group lived together in an apartment in Los Angeles referred to as the "Penthouse."

Several members of the group also belonged to criminal street gangs. Masubayashi and Johnson were members of the Tiny Rascals gang. Chung, Carrillo, and Baby were members of the Pinoy Real gang. Defendant was a member of the Sons of Samoa gang, but socialized mostly with Pinoy Real gang members. Lee was a member of the Asian Mob Assassins gang.

The shooting of Johnson and Masubayashi stemmed from various disputes within the group. Chung was angry with Johnson because Johnson had received a speeding ticket when he was driving Chung's Jeep Cherokee and had provided the police officer with false identification. The police went to

Chung's house and questioned him. Chung worried that he would be in violation of his parole because of the car incident. Chung was also upset with Masubayashi after Chung was nearly caught committing bank fraud. Chung threatened Masubayashi with a butcher knife over the incident and told him to watch his back. Chung called Johnson and Masubayashi "snitches" based on the incidents. Chung also wanted to replace Masubayashi as Peter Song's second-in-command in the criminal enterprise. Masubayashi and Johnson eventually moved out of the Penthouse and lived in an apartment in Anaheim owned by Takahisa Suzuki.

On the evening of November 11, 1997, defendant, Chung, Carrillo, and Lee were at the Penthouse when Chung began complaining about Masubayashi and Johnson. Defendant volunteered to kill Masubayashi, stating, "We're going to handle them, take care of them" and "Let's go smoke those motherfuckers." Chung, Lee, and Carrillo responded, "Let's do it." Carrillo noticed that defendant possessed a .357 magnum handgun, which Carrillo had previously seen defendant carry on numerous occasions.

Lee drove defendant, Chung, and Carrillo in Chung's Jeep Cherokee to the home of Allan Quiambao, another Pinoy Real gang member. During the drive, defendant repeated that he would kill Johnson and Masubayashi. The group met Quiambao outside and told him that they were headed to Anaheim to "do" Johnson and Masubayashi. Quiambao understood this to mean the group would kill them.

The group returned to the Jeep and continued driving toward Anaheim. A police officer stopped the Jeep after Carrillo threw a cigarette butt out the window. Carrillo saw defendant

hide his gun inside the crack of the seats prior to the stop and then tuck it in his waistband after the police officer left.

Lee parked the Jeep in a parking lot near Suzuki's apartment complex. The group agreed that only defendant and Carrillo would go to the apartment because there was no animosity between them and Masubayashi and Johnson. Lee and Chung would wait in the Jeep. As they were walking to the apartment, defendant told Carrillo that he was going to "do," meaning kill, everyone in the apartment. Defendant telephoned Johnson, who had been grocery shopping with his girlfriend, Sia Her. Johnson and Her met defendant and Carrillo outside the apartment complex. The four continued to Suzuki's apartment, where Masubayashi and his girlfriend, Alexis Huliganga, were asleep inside. Masubayashi awoke and the men decided to go out to a strip club or to shoot pool. Defendant, who weighed more than 300 pounds, was wearing dark jeans and a green-and-black plaid flannel; Carrillo, who had a thinner build, wore a white jersey with black letters and a beanie on his head.

As the group walked toward Masubayashi's car, they noticed a police patrol car driving by. Masubayashi and Carrillo saw defendant remove his gun from his waistband and hide it beneath the tire of a parked car. Defendant and Carrillo returned to Suzuki's apartment, where defendant explained to Her that they had come back because the police were outside and he was "strapped," meaning he had a gun. After the patrol car left, Johnson returned to the apartment to collect defendant and Carrillo, while Masubayashi continued walking to his vehicle. Defendant retrieved the gun once outside and Masubayashi picked the men up in his car, a two-door Nissan. Carrillo sat behind Masubayashi and defendant sat behind Johnson.

Defendant and Carrillo told Masubayashi that they also wanted to drive and directed him to Chung's Jeep. Unbeknownst to Masubayashi and Johnson, Lee and Chung were hiding inside the Jeep. Masubayashi parked his car next to the Jeep and Johnson got out of the front seat to let defendant and Carrillo exit the car. Masubayashi saw Carrillo walk toward the back of the Nissan while defendant stayed beside the passenger door. Masubayashi recalled that he had left compact discs in Chung's Jeep and opened his car door to retrieve them. Defendant suddenly drew his gun and shot Johnson in the head. Masubayashi turned and saw Johnson's head bobbing. Defendant next bent inside the Nissan and shot Masubayashi. Just before he was shot, Masubayashi remembered seeing defendant's dark forearm and his green-and-black flannel shirt inside the car and defendant's gun pointed at him.

Masubayashi dashed out of the car and ran through the parking lot toward a Jack in the Box restaurant. Defendant shot at Masubayashi several more times. Masubayashi ran across the street as defendant and Carrillo climbed into the backseat of the Jeep. Lee started the car and drove toward Masubayashi, saying, "I'm going to run his ass over." Masubayashi hid behind a telephone pole, and Lee stopped the Jeep just in front of it. Masubayashi ran away from the Jeep and collapsed in the middle of the street. Carrillo became aware of people watching in front of a nearby restaurant and saw a uniformed security guard nearby. Defendant told Lee to let him out of the Jeep so he could "finish John off." Defendant got out of the Jeep and walked toward Masubayashi. Lee, Chung, and Carrillo drove off.

A restaurant patron and private security guard noticed Masubayashi lying in the street and stopped to help him. Police

officers arrived at the scene shortly thereafter and found Masubayashi lying on his back in the middle of the street with a gunshot wound to his chest. Masubayashi was taken to the hospital, where he told police officers that defendant had shot him and Johnson. A forensic pathologist who performed an autopsy on Johnson testified that Johnson died from a close range gunshot wound to his neck and brain. An analysis of bullets and fragments indicated the shots were fired from either a .38 special or .357 magnum handgun.

Two eyewitnesses — Jose Rodriguez and John Fowler — testified regarding their observations. In the early morning hours of November 12, 1997, Rodriguez, Fowler, and Matthew Towne[2] were seated on a bench outside the Gateway Urgent Care Clinic in Anaheim when they heard what sounded like a car backfiring. Rodriguez took a few steps forward and peered around the side of a brick wall. He saw the profile of a man approximately 50 feet away in a dark parking lot firing a gun in the direction of the Jack in the Box. Rodriguez described the shooter as a Black male, approximately 25 years old, about six feet tall, heavyset, and wearing dark clothing. Fowler looked around the side of the brick wall and noticed a black car parked with the engine running. He also saw the silhouette of a man walking across the parking lot toward the Jack in the Box and firing a gun. He described the shooter as possibly African-American, approximately five feet and ten inches tall, thin to medium build, and possibly wearing a beanie. However, Fowler also emphasized at trial that it was dark and difficult to

---

[2] As discussed *post*, Towne was unavailable at the guilt phase of trial. His statements to police officers, made shortly after the shooting, were not admitted at trial.

determine how big the shooter was, and that he simply saw a "basic shadow" walking across the parking lot. The men ran into the clinic to call 911.

Carrillo returned to Quiambao's house after the shooting and changed clothes. Carrillo seemed scared, paranoid, and frantic. He appeared to be praying and repeatedly stated, "They shot him." When Quiambao asked Carrillo who shot them, Carrillo replied, "T-Strong."[3]

Defendant arrived at Quiambao's home an hour or two later. Defendant told Carrillo that he had discarded the gun and ran from Anaheim to Quiambao's house. Quiambao repeatedly asked defendant why he had shot Johnson and Masubayashi, but defendant did not respond. Quiambao asked defendant what he did with the gun, and defendant replied that he threw it away. Defendant left Quiambao's house; Carrillo stayed there and fell asleep.

Later that morning, defendant and Carrillo purchased fake identification cards and used them to travel with Baby to Utah. They lived with defendant's relatives in Salt Lake City for five or six months. In 1998, Carrillo and Baby returned to Los Angeles and defendant remained in Utah.

In late 1999 or early 2000, Masubayashi began dating Glenda Perdon (Glenda Bloemhof at trial). Unbeknownst to Masubayashi, Perdon had previously associated with members of the Pinoy Real gang, and she had seen defendant at Quiambao's house on a few occasions.

In April 2000, Masubayashi spotted defendant in the parking lot of the Ramona Hotel in Cerritos. Masubayashi had

---

[3] "T-Strong" was defendant's given name at birth.

not seen defendant since the shooting. He told Perdon that he had observed defendant and wanted to notify the police. Perdon mentioned that she had overheard defendant brag about killing Johnson when she was at defendant's house for a barbeque. According to Perdon, defendant said, "I came in my pants when I saw that nigger flop after I shot him." Perdon also relayed that defendant had mentioned the name "John" when he described the shooting, which Masubayashi understood to refer to him. Perdon recalled that this conversation took place around the time of the shooting and that defendant had then fled to Utah.

Shortly thereafter, Masubayashi and Perdon went to the Anaheim police station to provide additional information. Masubayashi informed a police detective that he had seen defendant. He also told the detective that, based on his conversation with Perdon, it was possible Clarito Mina had been driving the Jeep on the night in question. At trial, however, Masubayashi testified that he was sure Lee had been driving the Jeep.

In mid-May 2000, defendant was arrested on an outstanding warrant for unrelated charges. Carrillo, Chung, and Lee were also eventually arrested. In October 2001, a felony complaint was filed charging defendant with murder, attempted murder, and conspiracy to commit murder.

Defendant was jointly tried before a single jury with codefendant Lee at the guilt phase trial. A death verdict was not sought against Lee. Chung also was charged with first degree murder, conspiracy to commit murder, and premeditated attempted murder, but he was tried separately. Carrillo testified for the prosecution as part of a plea bargain under

which he pleaded guilty to voluntary manslaughter and attempted murder, for which he received a six-year sentence.

### 2. *Defense evidence*

Defendant presented evidence suggesting that it was Carrillo who shot Johnson and Masubayashi. The defense also sought to portray Carrillo as a liar and an unreliable witness.

Testifying on his own behalf, defendant maintained that he was on good terms with Johnson and Masubayashi, and denied shooting them. He said that on the night in question, he and Carrillo went to Suzuki's apartment and spoke with Johnson and Masubayashi about going out. Defendant acknowledged that he hid a gun, a .357 magnum, under the tire well of a parked vehicle when a police car approached the group, but testified that it was Carrillo who subsequently retrieved the weapon.

According to defendant, the foursome got into Masubayashi's car and drove to pick up Chung at his Jeep. Defendant testified that Masubayashi parked his car next to Chung's Jeep and Johnson let defendant out of the car. As defendant was walking toward the Jeep, he heard two gunshots, turned around, and saw Carrillo's arm in Masubayashi's car. Defendant related that he pushed Carrillo up against the car and yelled, "What the fuck are you doing?" Carrillo replied, "It's a setup, man. It's a setup."

Defendant testified that he saw Masubayashi run from the car as Carrillo followed and shot at him. Defendant maintained that Carrillo returned to the Jeep and yelled, "Let's go, let's go, let's go." Defendant conceded that he instructed the driver to "go get" Masubayashi, but maintained that he intended to help

Masubayashi, not run him over.[4]  Carrillo began screaming, "Yeah, we've got to get him.  We've got to get him.  He seen us.  He knows where we live.  We've got to do this.  We got to finish him."  Defendant told the group to stop the Jeep because he "wasn't going to be a part of it," and he got out of the car and started running.

Defendant testified that he made his way to Quiambao's house, where he met Carrillo outside.  Defendant asked Carrillo why he shot Johnson and Masubayashi.  Carrillo replied that "it was a setup" and claimed that Masubayashi had a gun.  Once inside, Quiambao asked defendant why he had shot Johnson.  Defendant did not respond and looked at Carrillo and Quiambao.  He then asked Quiambao to get him something to drink.  When Quiambao left the room, defendant asked Carrillo what he had told Quiambao.  According to defendant, Carrillo responded that he thought defendant was in jail and he did not know what to do, so he told Quiambao that defendant shot Johnson.  When Quiambao returned with a drink, he again asked defendant why he shot Johnson and Masubayashi, adding, "They are our friends."  Defendant responded, "Why?  Why don't you shut the hell up?"

Later that morning, defendant testified, he and Baby went to see someone about getting fake identification.  The following day, defendant, Baby, and Carrillo flew to Salt Lake City.  The group lived in a hotel for several weeks and eventually moved to a family member's house.  Defendant said that he left periodically, traveling to San Francisco, Portland, Seattle, and

---

[4]  Defendant initially refused to identify who was driving the Jeep after the shooting, but later testified that Clarito Mina was the driver, not Lee.

Los Angeles, until he returned to Los Angeles in late 1999. Defendant claimed that he went into hiding in Salt Lake City because he refused to go to jail for a crime he did not commit.

Defendant admitted that he "ran" with the Sons of Samoa gang, but denied being an actual gang member. He acknowledged that he had been at Quiambao's house with Perdon and discussed Johnson's murder and the shooting of Masubayashi, but denied ever making the statement to Perdon that he shot Johnson.

Carrillo's sister-in-law, Alana Swift Eagle, testified that Carrillo drank heavily and used methamphetamine daily. She also related that Carrillo was a dishonest person and a very manipulative liar.

The defense presented evidence that, despite Carrillo's recollection that one of the rounds fired by defendant hit a metal pole, there was no ballistic evidence recovered from that vicinity. Additional evidence was introduced suggesting that the bullet recovered from Johnson's body would not have been fired by a Smith & Wesson-manufactured .357 handgun, although Carrillo maintained that defendant's gun was made by Smith & Wesson. However, the criminologist's earlier testimony that either a .38 special or a .357 magnum handgun fired the bullet that killed Johnson was not called into question. She also testified that many gun parts are interchangeable and a person could attach a pair of Smith & Wesson grips onto another brand of gun.

Correctional nurse Jean Huang treated Carrillo for chest pain when he was incarcerated at the Orange County Jail. Huang testified that Carrillo had told her that he had been a frequent methamphetamine user and heavy alcohol drinker.

Forensic toxicologist Darrell Clardy testified that a person who consumed as much alcohol and drugs as Carrillo reported would likely be disoriented, confused, and susceptible to misinterpreting what was happening.

Shawn Monroe testified that defendant and Carrillo came to his home in November 1997, at which time Carrillo inquired about procuring false identification cards. When Monroe asked Carrillo why the fake identifications were needed, Carrillo responded that he "just shot some fools in Orange County and he "need[ed] to leave town." Defendant instructed Carrillo to "shut up." Based on their interaction, Monroe thought that Carrillo was the shooter.

Quiambao also testified that in 2001 Carrillo admitted that he was the shooter. However, Quiambao was impeached on cross-examination by a taped interview with detectives, in which he stated that defendant was the shooter.

## B. Penalty Phase Evidence

### 1. Prosecution evidence

The prosecution's case in aggravation included evidence regarding defendant's criminal history and victim impact testimony.

In March 1988, when defendant was in seventh grade, he exposed himself to two female students and touched their breasts and buttocks. In June 1991, defendant and three other individuals robbed Thomas Kinsey. In December 1993, defendant robbed another person, John Hagen, at gunpoint.

Two of Johnson's cousins described their close relationship with him and explained how his death impacted their families'

lives. Johnson's girlfriend described the grief and emotional struggle she felt after Johnson died.

### 2. *Defense evidence*

In mitigation, the defense focused on defendant's family history, background and character, brain activity, and adjustment to prison. Concerning these matters, defendant presented the testimony of several family members as well as various experts. He also took the stand on his own behalf once again.

Professor Inoke Funaki testified as an expert witness on Tongan culture. He described Tongan parenting style as authoritarian and strict, adding that it is common for Tongan husbands to physically abuse their wives and children.

Defendant and several of his family members described the emotional and physical abuse that occurred in defendant's home. Defendant's parents argued constantly, and defendant's father often beat his mother. Defendant's parents also hit defendant and beat him with a broom handle. Defendant was described as a loving brother, protective family member, caring, courteous, and respectful.

Defendant was the target of ridicule in elementary school because he was bigger than the other children and did not have nice clothes. He was respectful to his teachers and administrators in elementary and middle school. Defendant's high school football coach described him as kind, polite, and a good kid. Defendant quit high school in tenth grade and started working in construction to help his family financially.

In 1992, defendant provided mouth-to-mouth resuscitation to Monroe when he was shot by a rival gang member. Defendant befriended a young woman who had felt

unsafe when she was walking to school and he became a father figure to her.

Defendant denied robbing Kinsey. He admitted to robbing Hagen, but testified that he accepted responsibility when contacted by the police and expressed remorse.

In July 1997, defendant witnessed the murder of his cousin, Loma Mataele. Defendant was very close to Loma and was heartbroken by her death. He testified that Loma's death "really messed [him] up in the head."

Following the shooting of Johnson and Masubayashi, defendant set up weekly family meetings to encourage family members to better themselves and help each other. Defendant recognized that he had made mistakes in his own life.

Several experts testified regarding defendant's brain function and ability to benefit from life in prison. Dr. Kenneth Nudleman testified that defendant's neurological test results were generally in the normal range, and there were no structural changes to the brain associated with violent behavior. Clinical psychologist and neuropsychologist Dr. Timothy Collister testified that defendant performed well in the neurological tests he administered, was very intelligent, and gave straightforward and honest answers. Collister opined that defendant could benefit from education and rehabilitation.

Dr. Nancy Kaser-Boyd opined that defendant suffered from attention deficit hyperactivity disorder and posttraumatic stress disorder, but his above average intelligence, normal brain function, and relationships would mitigate some of the risk factors in defendant's life, including child abuse, domestic violence, racism, and poverty. Psychopharmacologist Dr. Ronald Siegel testified regarding the effects of

methamphetamine, including paranoia, irritability, impulsivity, psychosis, and delusions resulting from sustained use.

James Esten, a retired employee from the Department of Corrections and Rehabilitation, testified as a correctional consultant. Based on his review of defendant's custodial history and an interview with defendant, Esten opined that defendant was suitable for and adaptable to prison life, and was a good candidate to lead a productive and nonviolent life in prison.

## II. DISCUSSION

### A. Guilt Phase Issues

#### *1. Excusal of two prospective jurors for cause*

Defendant contends the trial court erroneously excluded two prospective jurors based on their death penalty views in violation of the constitutional standards set forth in *Witherspoon v. Illinois* (1968) 391 U.S. 510 and *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*). We conclude that the record fairly supports the excusals and therefore uphold the trial court's rulings.

#### *a. Legal principles*

"Under state and federal constitutional principles, a criminal defendant has the right to be tried by an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.) With regard to jury selection in a capital case, decisions by this court and the United States Supreme Court have made clear that prospective jurors' personal opposition to the death penalty is not a sufficient basis on which to remove them from jury service in a capital case, ' "so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of law." ' " (*People v. Schultz* (2020) 10 Cal.5th 623, 646 (*Schultz*).)

"Excusal for cause is permissible, however, when the prospective juror's beliefs regarding the death penalty 'would "prevent or substantially impair the performance of his [or her] duties as a juror in accordance with [the court's] instructions and [the juror's] oath." ' " (*Schultz, supra*, 10 Cal.5th at p. 647, quoting *Witt, supra*, 469 U.S. at p. 424.) Although "a prospective juror may not be excused for cause based on 'general objections' or 'conscientious or religious scruples' against the death penalty [citation], excusal is proper when a prospective juror cannot 'consider and decide the facts impartially and conscientiously apply the law as charged by the court' [citation]." (*Schultz*, at p. 649.) This rule balances the interest of a criminal defendant, who "has a right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause," and the state's "strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 (*Uttecht*).)

We review a trial court's determination regarding juror bias for abuse of discretion. (*People v. Jones* (2012) 54 Cal.4th 1, 41 (*Jones*).) " '[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' [Citation.] As such, 'the reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the "definite impression" that he is biased, despite a failure to express clear views.' " (*Ibid.*; see also *Uttecht, supra*, 551 U.S. at p. 9 ["Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire,

16

and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors"].)

"During voir dire, jurors commonly supply conflicting or equivocal responses to questions directed at their potential bias or incapacity to serve. When such conflicting or equivocal answers are given, the trial court, through its observation of the juror's demeanor as well as through its evaluation of the juror's verbal responses, is best suited to reach a conclusion regarding the juror's actual state of mind. [Citation.] ' " 'There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror.' " ' [Citation.] '[T]he [trial court's] finding may be upheld even in the absence of clear statements from the juror that he or she is impaired because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." [Citation.] Thus, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State." ' " (*Jones*, *supra*, 54 Cal.4th at p. 41, quoting *Uttecht*, *supra*, 551 U.S. at p. 7; see also *People v. Duenas* (2012) 55 Cal.4th 1, 10 ["When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts

if supported by substantial evidence"].)  "Even when ' "[t]he precise wording of the question asked of [the venireman], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty," the need to defer to the trial court remains because so much may turn on a potential juror's demeanor.' " (*Jones*, at p. 42, quoting *Uttecht*, at p. 8.)

With this standard in mind, we turn to whether the trial court properly excluded the two prospective jurors in question.

### b. *Analysis*

#### i. *Prospective Juror No. 259*

In her questionnaire, Prospective Juror No. 259 signaled a degree of uncertainty and discomfort regarding the death penalty.  Asked whether there was anything that she wanted to bring to the court's attention that might affect her ability to be a fair and impartial juror in this case, Prospective Juror No. 259 wrote:  "Little uncomfortable seeing how young the [two] men were, and finding out the crime was done [eight] years ago.  Just questioning myself if I can be impartial, without being sympathetic."  She also stated that she did not believe the death penalty was a deterrent and that it was for "evil people in the world, who cannot be reformed" and who "will continue to murder, with no remorse."  She noted that she used to believe that the death penalty was "for no one," but "too many crimes are [by] repeat murderers."  She also stated that she "d[id]n't care for" having the responsibility of deciding whether someone lives or dies and she "would rather give that responsibility to someone else."  She added that in deciding whether a person should receive the penalty, she "would have to be sure that it serves a purpose — life is too precious for a chosen few to take

it away." She also indicated in her questionnaire, however, that she would not have a problem voting for the death penalty if she believed the individual committed the crime willfully and without remorse and has no chance of being rehabilitated, that she could set aside her personal feelings and follow the law, and that she would look at all the criteria before deciding whether to vote for death or life imprisonment.

During voir dire for the selection of seated jurors, defendant's counsel asked Prospective Juror No. 259 how she felt about sitting in judgment in a case of this nature. Prospective Juror No. 259 answered, "I'm hoping the prosecution doesn't have enough evidence to get to the second phase." She added, "I don't want to see the second phase. I see two innocent men, and I'm hoping that he doesn't have enough." Defendant's counsel clarified that Prospective Juror No. 259 should assume a defendant's innocence before the commencement of trial, and asked whether, assuming that they did get to the second phase, she could engage in the weighing process and consider the appropriate factors. Prospective Juror No. 259 responded that she could do so and would keep an open mind.

Counsel for codefendant Lee asked Prospective Juror No. 259 whether she had concerns about her ability to give her individual opinion at the end of the case. Prospective Juror No. 259 stated that she did not, but defense counsel observed that she had "hesitated a little bit." Prospective Juror No. 259 responded, "The only thing I have is I just see these men. They're just so young." She added, "I've got sons about that age. Maybe that might taint my view a little bit." Counsel explained that it was okay to feel sympathy for the victims and the defendant, but that it was not okay to have it affect a juror's

decision in the guilt phase.  Prospective Juror No. 259 replied, "I could do that, but it's going — going to — it's going to be very hard."  She reiterated:  "It's something I don't want to do.  I can do it.  I've been in trials before where I had to take the facts, but it's going to be very hard."

The prosecutor then questioned Prospective Juror No. 259 about her prior comment that she hoped there would be insufficient evidence at the guilt phase.  Prospective Juror No. 259 acknowledged that she had said that.  She reiterated that she did not want to get to the penalty phase and hoped the prosecutor did not have enough evidence.  She added: "If you have enough to convince me, I don't mind getting to the second phase.  But, you know, if you're asking me how do I feel about the second phase, I don't want to get to the second phase if at all possible."  She stated that she understood the prosecutor's cause for concern, but explained, "I actually think you have the bigger burden than the other two lawyers.  Because I actually see them as innocent and I actually think you have a bigger burden to tell me what you believe to make them guilty.  And that's why I say, yeah, yeah, well, you're right.  I am pulling for them."  She added:  "I'll tell you right now.  Because I don't want to get to the second phase.  I don't."  The prosecutor asked, "Because of the way you feel, do you think that would substantially impair your ability to render — I use this term that — everybody says 'I don't want to say I'm unfair,' but do you think it would substantially impair your ability to render a fair verdict, either at the guilt or the penalty phase?"  Prospective Juror No. 259 responded, "Yes."

The trial court granted the prosecutor's request to excuse Prospective Juror No. 259 for cause.  The court noted that she had equivocated in her questionnaire when she stated that she

"would have to be sure that the death penalty serves a purpose" and "life is too precious for a chosen few to take it away." The court also pointed to her statement in court that she would be pulling for the defense and subsequent admission that this would substantially impair her ability to return a death verdict.

Viewed as a whole, Prospective Juror No. 259's written and oral responses to questions regarding her ability to impose the death penalty in this case demonstrated a potential bias. She acknowledged several times that she was uncomfortable after seeing how young the defendants were in this case, and that their age might taint her view and render her biased toward the defense. She repeatedly and candidly admitted that she was "pulling for" defendants, and at least six times stated that she hoped the prosecutor did not have enough evidence to get to the penalty phase. Above all else, she ultimately admitted that her views would substantially impair her ability to render a fair verdict, either at the guilt or penalty phase. We conclude the trial court acted well within its discretion in excusing Prospective Juror No. 259.

### ii. Prospective Juror No. 190

Prospective Juror No. 190's questionnaire responses reflected doubt about her ability to vote for the death penalty. She wrote that she has "much ambivalence about the death penalty" and she "[h]ate[s] the death penalty." When asked whether she would make any changes to the criminal justice system, Prospective Juror No. 190 wrote that she would "eliminate death penalty — speed up system." In response to a question regarding whether she would like to bring anything to the court's attention that might affect her ability to be a fair and impartial juror in this case, Prospective Juror No. 190 wrote:

"Though I am not morally opposed to the death penalty, I would not vote for it because if a mistake it couldn't be undone." She added that she "formerly considered the death penalty immoral, but now just am concerned because human error might cause a wrong decision." She also wrote that she was "not sure it is our right" to decide whether defendant should receive the death penalty. However, she answered in the negative when asked whether she held an opinion concerning the death penalty that would make her automatically refuse to vote for the death penalty in any case. She also checked "Agree Somewhat" in response to the questionnaire statement "Any person who kills another should get the death penalty," adding that although she was "scared to make a mistake, sometimes it is the only answer." She further indicated that she could set aside her personal feelings regarding what the law ought to be and follow the law as the court explains it to her.

During voir dire, Prospective Juror No. 190 offered that she had been "reflecting" since completing the jury questionnaire and her views had changed. She stated: "And I found that I — when I filled it out, I thought I was more anti death penalty than I actually am. I'm coming down more in the middle." She added: "Initially when I filled it out, I thought that I would favor life without parole . . . at all times or in most circumstances. But in looking at myself, I also think that death can be a moral decision after examining what I do believe." She explained that she "didn't realize that we would have set factors to consider. And I'm grateful and relieved that we will, should we get there."

Prospective Juror No. 190 also indicated that she "ha[d] concerns looking at our system as a whole. Whereas 12 people might find one way, the same exact case, 12 people tomorrow

might find another way. So it's the whole system that concerns me. In this case, I think I can focus just on this case." When asked to clarify, Prospective Juror No. 190 reiterated, "I just think it's a flaw in the system." She later stated, "And I do have concerns about — for the same reason, because the system is flawed, that a mistake might be made; but I also think that it could be certain beyond a reasonable doubt. And I could vote for the death penalty."

Later in voir dire, the prosecutor questioned Prospective Juror No. 190 about her change in attitude regarding the death penalty. The following colloquy occurred:

"[Prosecutor]: [W]hen I see a juror who says, 'I could not vote for [the death penalty],' and then they completely change and say, 'It's moral, and I could vote for it' —

"[Prospective Juror No. 190]: Right.

"[Prosecutor]: — Can you understand that I'd be concerned about that?

"[Prospective Juror No. 190]: Absolutely. I can definitely understand.

"[Prosecutor]: What is it that you heard that hasn't just educated you but it's made you completely change your mind about whether you could fairly evaluate evidence and vote for a death verdict?

"[Prospective Juror No. 190]: When I wrote that, I'm thinking when — especially when you're a child. But, as you're growing up, even though I wake up in the morning and the news is that somebody has been put to death for a crime, I just get sick. I mean I really hate that. And the thought that one person could have been put to death for a crime they didn't commit

makes me sick. So that was what I was thinking when I wrote that. However, in my right and wrong, moral and not moral world, I believe that the death penalty is a valid punishment, a moral and right punishment. Okay. But I do have those concerns, maybe I wouldn't be fair to you or to — you know, if we got to the penalty phase.

"[Prosecutor]: Okay.

"[Prospective Juror No. 190]: It's possible.

"[Prosecutor]: Well, that's — that's the crux of where I'm going.

"[Prospective Juror No. 190]: Okay.

"[Prosecutor]: And any time I pick specific questions it's all going to the same place ultimately.

"[Prospective Juror No. 190]: Okay.

"[Prosecutor]: So let me ask you: You say maybe you could be fair. I'll use one of [defense counsel]'s phrases. . . . Dig deep and tell me. Could you be fair to both sides or not? Could you — would your beliefs substantially impair your ability to be a fair juror in this case?

"[Prospective Juror No. 190]: No."

In response to further questioning from the prosecutor regarding her written response questioning whether it was a juror's right to impose the death penalty, Prospective Juror No. 190 stated: "Exactly. Exactly. I'm not sure." When the prosecutor pointed out the inconsistency between her written and voir dire responses, Prospective Juror No. 190 stated, "I'm not sure it's our right to take a life, the state's right to take a life," but added, "I am sure it's right for the state to — that it is okay for the state to do that. I am sure. I have an emotional

reaction, but I'm sure that's okay." When the prosecutor asked her what caused her to change her mind, she responded: "I'm saying in — where I'm saying there is truth and there is right and there is morality, that it is moral if — if it's, you know — if the truth is found, then it is moral to take a life. However, in my emotional reaction in my everyday world and knowing that people are flawed, it would be — it would be — my emotional reaction is that it's difficult. It's — it's — if a mistake could be made it would be hard."

The prosecutor agreed that the job of a capital juror would be very difficult, but pointed out that Prospective Juror No. 190 wrote on her questionnaire that she hates the death penalty. She agreed, "I do. I hate that we have to have it." The prosecutor responded, "But that's not what you wrote." When Prospective Juror No. 190 was asked whether she believed that she could be fair and neutral, she responded that she did not want to be here but she believed she could be fair and neutral. When asked to confirm that she was neutral now, she responded: "I hate the death penalty. I hate the death penalty. I hate that we have to have the death penalty. . . . But I do think I could vote on it."

Outside the presence of the jury, defense counsel expressed concern that the questioning was too extensive and was becoming adversarial in an effort to establish cause. The trial court noted that it had granted a challenge for cause raised by defense counsel the previous day due to an "extreme inconsistency" between what a prospective juror said in court and in the questionnaire, and allowed the prosecutor to continue because Prospective Juror No. 190 was "hugely inconsistent" in her questionnaire responses compared with her statements during voir dire.

In response to further questioning, Prospective Juror No. 190 explained that she changed her mind regarding her ability vote for a death penalty after learning that she could consider aggravating and mitigating factors. She reiterated that she would rather not have to impose the death penalty, but it was her position "right now" that she would be neutral. When asked whether she would be pulling for one side or the other at the beginning of the penalty phase, she responded: "I . . . would rather not have to — I think I probably would rather not have to impose the death penalty." The prosecutor asked whether that meant she would be "pulling for the defendant, Mr. Mataele, hoping that there would be insufficient evidence." She conceded, "I probably would. I would probably hope that I would be able to weigh the factors honestly in favor of the defendant."

The trial court granted the prosecutor's request to excuse Prospective Juror No. 190 for cause. The court explained: "I have already commented that she's equivocal on this and hugely inconsistent, and her credibility with me in open court is shattered. I do not believe her when she says that she could be a fair and impartial juror. She's all over the map. Her statements and her [jury] questionnaire are straightforward and dramatic in terms of her opposition to the death penalty and when she said she would not vote for the death penalty. So, for all those reasons, the challenge for cause on [Prospective Juror No.] 190 is granted."

We conclude that substantial evidence supports the trial court's conclusion that Prospective Juror No. 190's views regarding capital punishment would prevent or substantially impair the performance of her duties as a juror. She indicated in her questionnaire response that she would not vote for death

because if it were a mistake it could not be undone, and expressed concern that human error could result in the wrong decision. Several times during voir dire, she repeated her concerns regarding the possibility of a mistake being made and acknowledged that she might not be fair to the prosecutor at the penalty phase and that she probably would be pulling for the defendant. Although she also stated during voir dire that she thought she could vote for the death penalty and that her views had evolved since completing the jury questionnaire, the trial court found her to be "hugely inconsistent" and equivocal, and stated that it did not believe her when she said that she could be a fair and impartial juror.

As the high court has observed, "[t]he judgment as to 'whether a venireman is biased . . . is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference . . . on direct review[.]'" (*Uttecht, supra,* 551 U.S. at p. 7.) In *Witt*, the Supreme Court reaffirmed that "'[t]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon a such a question of fact, except in a clear case.'" (*Witt, supra,* 469 U.S. at p. 428, fn. 9.) Given Prospective Juror No. 190's conflicting responses and the court's determination that she was equivocal and not credible when she said she could impose the death penalty, we must defer to the trial court, which "was in the best position to determine which of these two conflicting versions represented [the prospective juror's] true state of mind." (*People v. Cowan* (2010) 50 Cal.4th 401, 441 (*Cowan*); see *Jones, supra,* 54 Cal.4th at p. 43 [holding

that the prospective juror's "equivocation in response to questioning requires that we defer to the trial court's assessment of her initial and ultimate state of mind"]; *People v. Martinez* (2009) 47 Cal.4th 399, 431–432 [when prospective juror has made statements that support exclusion for cause, the fact that the juror also made statements that might have warranted retaining her on the jury does not change the conclusion that substantial evidence supports the trial court's ruling]; *People v. Merriman* (2014) 60 Cal.4th 1, 55–56 (*Merriman*) ["Having assessed [the prospective juror's] demeanor firsthand during questioning, the trial court could properly find the questionnaire responses the better reflection of [the juror's] true state of mind"].)  Accordingly, we conclude the court acted within its discretion in excusing Prospective Juror No. 190.

### 2. *Constitutionality of substantial impairment standard for determining juror bias in capital cases*

Relatedly, defendant contends that the "substantial impairment" standard used for determining jury bias in capital cases violates his right to an impartial jury, thereby requiring reversal of his death judgment.  We disagree.

The Sixth Amendment of the United States Constitution guarantees the right of a defendant in all criminal prosecutions to a trial by an "impartial jury." (U.S. Const., 6th Amend.)  The California Constitution independently guarantees the right to trial by an impartial jury. (Cal. Const., art. I, § 16; see *People v. Thomas* (2011) 51 Cal.4th 449, 462 (*Thomas*).)  "The Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard

extrajudicial influences, and decide guilt or innocence 'based on the evidence presented in court.' " (*Skilling v. United States* (2010) 561 U.S. 358, 438.) "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. [Citations.] 'Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.' " (*Morgan v. Illinois* (1992) 504 U.S. 719, 729–730, italics omitted.)

"In *Witherspoon v. Illinois* [ ], the United States Supreme Court held that a prospective juror cannot be excused for cause based on his or her views on capital punishment without violating a defendant's right to an impartial jury under the Sixth Amendment, unless, as is pertinent here, the prospective juror made it 'unmistakably clear' that he or she would '*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case . . . .' [Citation.] In *Wainwright v. Witt* [ ], however, the court revisited *Witherspoon* and declared that the proper standard was 'whether the [prospective] juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " (*People v. Griffin* (2004) 33 Cal.4th 536, 558 (*Griffin*), overruled on another ground by *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)

The high court has on numerous occasions reaffirmed *Witt*'s substantial impairment standard in determining jury bias in capital cases. (E.g., *Uttecht, supra,* 551 U.S. at p. 9;

*Morgan v. Illinois*, *supra*, 504 U.S. at p. 728; *Gray v. Mississippi* (1987) 481 U.S. 648, 658.) In *Uttecht*, the court reviewed its jurisprudence in this area, concluding: "These precedents establish at least four principles of relevance here. First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. [Citation.] Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. [Citation.] Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. [Citation.] Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." (*Uttecht*, at p. 9.)

Defendant argues that the substantial impairment standard is improperly premised on balancing the competing interests of the State and the defendant, rather than the intentions of the framers of the United States Constitution. In making this argument, defendant relies upon several recent United States Supreme Court decisions addressing the Sixth Amendment, in which that court emphasized the need to interpret that provision in light of its historical context. (*Alleyne v. United States* (2013) 570 U.S. 99; *Blakely v. Washington* (2004) 542 U.S. 296; *Crawford v. Washington* (2004) 541 U.S. 36; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (1999) 530 U.S. 466; *Jones v. United States* (1999) 526 U.S. 227.)

As a threshold matter, we are mindful that the high court's interpretation of the appropriate standard for determining jury bias in capital cases under the Sixth Amendment is binding on this court. (*People v. Taylor* (2009) 47 Cal.4th 850, 865, fn. 7 ["Because, as defendant recognizes, this court cannot overrule a decision of the United States Supreme Court, we do not address his attack on *Faretta* [*v. California* (1975) 422 U.S. 806]"]; *Stock v. Plunkett* (1919) 181 Cal. 193, 194–195 [decisions of the United States Supreme Court involving a federal question are binding on this court].) This is so even if we were to agree with defendant that subsequent decisions by that court have called into question whether the substantial impairment standard is consistent with the Sixth Amendment right to an impartial jury. (See *Hohn v. United States* (1998) 524 U.S. 236, 253 [United States Supreme Court decisions remain binding precedent until high court "see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continued vitality"].) Moreover, the Supreme Court has reaffirmed the substantial impairment standard even after issuing the Sixth Amendment decisions cited by defendant. (*White v. Wheeler* (2015) 577 U.S. 73, 77 [" 'a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause' "]; *Uttecht, supra,* 551 U.S. at p. 9.) Accordingly, *Witt*'s substantial impairment standard remains binding on this court, and we are not at liberty to consider defendant's federal claim any further.

Nor do we find convincing defendant's corresponding contention that the substantial impairment standard violates his right to trial by an impartial jury under the state Constitution. "In *People v. Ghent* (1987) 43 Cal.3d 739, 767, we

adopted the *Witt* standard as the test for determining whether a defendant's right to an impartial jury under article I, section 16 of the state Constitution was violated by an excusal for cause based on a prospective juror's views on capital punishment." (*Griffin*, *supra*, 33 Cal.4th at p. 558; *Thomas*, *supra*, 51 Cal.4th at p. 462 [same]; *People v. Lancaster* (2007) 41 Cal.4th 50, 78 ["Under the applicable state and federal constitutional provisions, prospective jurors may be excused for cause if their views would prevent or substantially impair the performance of their duties"].)  Defendant offers no persuasive reason for us to reconsider whether this standard is consistent with the state Constitution's impartial jury guarantee.

For the reasons mentioned above, we conclude that the substantial impairment standard violates neither the federal nor state Constitutions.

### 3. *Denial of defendant's motion to dismiss charges*

Defendant contends the nearly four-year interval between the shootings and the filing of an amended felony complaint was unjustified and prejudiced his ability to defend against the charges, thereby violating his due process rights under the state and federal Constitutions.  We find no constitutional violation.

### a. *Background*

Johnson and Masubayashi were shot just after midnight on November 12, 1997, but defendant was not criminally charged with the resulting offenses until October 2001.  Before trial, defendant moved to dismiss the charges against him, arguing the passage of time between the shootings and the filing of charges violated his right to due process because it resulted in the unavailability of exculpatory witnesses and the loss of evidence material to his defense.  Specifically, defendant

claimed the asserted delay prejudiced his ability to locate witnesses and present other evidence to challenge the credibility of Carrillo and Quiambao. Defendant argued that the prosecution possessed evidence that he was the shooter based on Masubayashi's statements to police shortly after the shooting occurred, and could have pursued charges at that time.

The trial court reserved ruling on the motion until the conclusion of the penalty phase. Following trial, the court denied the motion, determining that the asserted prefiling delay had not prejudiced defendant. It also found that any "delay" was caused by defendant's flight from the crime scene and subsequent escape to Utah with Carrillo; his procurement of false identification documents and threatening witnesses who were involved in the case to get them to say nothing to the police; Lee and Chung giving false cross-alibis to the police the day after the shooting; the initial equivocation of Masubayashi regarding the driver of the Jeep; and legitimate police investigation in an effort to gather sufficient evidence to prove the case in court beyond a reasonable doubt, which was made more difficult because many of the material witnesses were admitted gang members.

### b. Discussion

"The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging." (*Cowan, supra,* 50 Cal.4th at p. 430.) A defendant seeking to dismiss a charge on this ground must first demonstrate prejudice arising from the delay, "such as by

showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time." (*People v. Abel* (2012) 53 Cal.4th 891, 908, (*Abel*).) " 'The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.' " (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*), quoting *People v. Catlin* (2001) 26 Cal.4th 81, 107.)  However, "[i]f the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified." (*Abel*, at p. 909; see *id.*, at pp. 908–909 ["Prejudice to a defendant from precharging delay is not presumed"].)

The state and federal constitutional standards regarding what justifies "delay" differ. (*Nelson*, *supra*, 43 Cal.4th at p. 1251.)  However, because the law under the California Constitution is at least as favorable to defendant as federal law in this regard, we apply California law to defendant's claim. (*Ibid.*; *Abel*, *supra*, 53 Cal.4th at p. 909, fn. 1.)

"[U]nder California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process." (*Nelson*, *supra*, 43 Cal.4th at p. 1255.)  "[W]hether the delay was negligent or purposeful is relevant to the balancing process.  Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation.  If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id.*, at p. 1256.)  "The justification for the delay is strong when there is 'investigative delay, [and] nothing else.' " (*Cowan*, *supra*, 50 Cal.4th at p. 431.) "A court should not second-guess the prosecution's decision regarding whether

sufficient evidence exists to warrant bringing charges. 'The due process clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. . . . Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.' " (*Nelson*, at p. 1256.)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]." (*Cowan, supra*, 50 Cal.4th at p. 431.) Because the trial court deferred ruling on defendant's motion to dismiss until after the trial had concluded, we will consider all evidence that was before the court up to that time. (*Ibid.*) Thus, evidence presented at trial may be used to support or reject defendant's assertion of unjustified prejudice.

Defendant first claims prejudice from Detective Guy Reneau's unavailability at trial due to health problems, meaning the defense could not examine him about statements Masubayashi had made. Detective Reneau was the original lead investigator on the case. He had interviewed Masubayashi at the hospital on November 12, 1997, and again at Masubayashi's home on November 18, 1997. At the hospital, when Reneau first asked Masubayashi who shot him, Masubayashi said, "I don't, I don't know." When asked again, Masubayashi said it was defendant. One week later, Masubayashi told Reneau that he recalled seeing an arm with defendant's flannel shirt inside Masubayashi's car when he was shot. These interviews were recorded and made available to the defense. Reneau was subsequently placed on medical leave and was not among the

officers who interviewed Masubayashi when he went to the police in April 2000. Notwithstanding Reneau's absence from trial, the defense questioned Masubayashi at the guilt phase regarding his prior statements to the detective.

We find that defendant has not demonstrated that the passage of time between the offenses and filing charges prejudiced him in this respect. Defendant had access to the taped interviews and transcripts of Reneau's interviews of Masubayashi, and he questioned Masubayashi extensively at trial regarding his prior statements. To the extent Masubayashi's interview with Reneau conflicted with Masubayashi's testimony, defendant was able to point out the inconsistencies to the jury without Reneau testifying. To the extent defendant claims that Reneau could have shed additional light on Masubayashi's statements in the taped interviews, his claim is speculative and unsupported by proof of actual prejudice. (*People v. Alexander* (2010) 49 Cal.4th 846, 875 (*Alexander*).)

Defendant further complains that the passage of time before charges were brought prevented him from acquiring evidence to impeach Carrillo's and Quiambao's credibility. In the trial court, defense counsel alleged that Carrillo was "engaged in various nefarious activities including bank fraud, money laundering, drug manufacturing and drug sales," but the asserted prefiling delay prevented the defense from "locating and interviewing witnesses who could offer evidence attacking his credibility by showing his character for dishonesty, the existence of his bias interest, and motive against defendant . . . ." Defense counsel alleged that in light of "the substantial delay in prosecution, the defense is unable to locate and interview Quiambao because he has changed his life around

and joined the United States Navy and is geographically unavailable to the defense." These speculative claims do not amount to a showing of actual prejudice. (*People v. Jones* (2013) 57 Cal.4th 899, 923.) Moreover, Carrillo and Quiambao testified at trial and defense counsel was able to challenge their credibility through their prior inconsistent statements, habitual drug use, and gang involvement.

Defendant argues that the asserted prefiling delay caused eyewitness Matthew Towne to become unavailable to testify at the guilt phase of trial. As noted previously, Towne was one of three bystanders positioned outside of the Gateway Urgent Care Clinic who saw the shooter. According to defense counsel's offers of proof made at the guilt and penalty phases (the circumstances surrounding which will be described in more detail *post*), Towne would have testified that he saw a shooter with a thin build in the parking lot across the street. At the time of the shooting, defendant weighed more than 300 pounds; Carrillo was closer to 160 pounds.

We conclude that Towne's unavailability at the guilt phase of trial was not caused by any delay in bringing the charges. Rather, the defense temporarily lost communication with Towne sometime *after* charges were filed, for reasons having no apparent connection to any pretrial delay. A private investigator for the defense first contacted Towne in February 2004, more than two years after defendant had been charged, at which time Towne agreed to testify whenever necessary. In November 2004, Towne moved from Indiana to Nevada, and he provided the investigator with a current address and telephone number. The investigator conducted a second recorded interview with Towne by telephone on January 15, 2005. However, in April 2005, the investigator was unable to reach

Towne using the number provided, and he did not regain contact with Towne until August 2005.  At a hearing on the motion to dismiss, the investigator stated that he chose not to compel Towne's attendance at trial through interstate compact because Towne had always been a cooperative witness and the investigator thought compulsion was unnecessary and would only alienate Towne.  Thus, even assuming Towne's testimony could have served any evidentiary purpose, no connection exists between Towne's unavailability and the passage of time before bringing the charges.  (*Alexander*, *supra*, 49 Cal.4th at p. 877.)

Defendant next contends the asserted prefiling delay impaired the defense effort to call witness Perdon to testify that defendant never made a comment to her in which he bragged about shooting Johnson.  As will be described *post*, defendant's alleged statement to Perdon, which Perdon then relayed to Masubayashi, was admitted notwithstanding the hearsay rule as an admission by a party opponent (Evid. Code, § 1220) within a prior inconsistent statement (*id.*, § 1235).  Contemporaneous police reports documented Perdon's interview from April 2000, and Perdon testified that she told police what she knew to be true at that time and that the incident was fresher in her mind in 2000 than 2005.

As we have held, prejudice from fading witness memories due to passage of time is diminished where contemporaneous police reports exist that may be introduced into evidence or used to refresh the witness's recollection.  (*Scherling v. Superior Court* (1978) 22 Cal.3d 493, 506.)  Thus, Perdon's ability at trial to independently recall a conversation that took place between her and defendant was not critical to the prosecution's case.  Moreover, as will also be described *post*, the trial court found that Perdon's inability to recall whether defendant admitted to

killing Johnson was evasive and untruthful. Therefore, the trial court's ruling suggests that Perdon's professed inability to recall defendant's inflammatory statement was not based on the passage of time. Furthermore, Perdon's testimony was "not of crucial significance" to the prosecution's case, which rested primarily on the testimony of Masubayashi, Carrillo, and Quiambao. (*Ibid.*)

In sum, defendant's claims of prejudice are speculative and inadequately supported. Accordingly, we conclude the trial court acted within its discretion when it denied defendant's motion to dismiss for lack of prejudice. Because we conclude the trial court properly found defendant was not prejudiced by the passage of time, there is no need to address defendant's further argument challenging the prosecutor's justifications for any asserted delay.

### 4. *Exclusion of Towne's hearsay statements*

As noted, eyewitness Towne could not be located at the time of the guilt phase trial. Defendant contends the trial court abused its discretion when it excluded Towne's out-of-court statements describing the shooter in a manner that was inconsistent with defendant's build on the night in question. Defendant asserts the statements should have been admitted under the spontaneous statement exception to the hearsay rule. (Evid. Code, § 1240.) We conclude there was no error.

Officer Terrance Bowers interviewed Towne shortly after the shooting occurred. Towne told Bowers that he saw a thin male, approximately five feet and eight inches to six feet tall, walking through the parking lot away from the driver's door of Masubayashi's car and firing three to four gunshots in an eastbound direction. Defendant sought to introduce Towne's

statements to Bowers as spontaneous statements. After the prosecution objected on hearsay grounds, the trial court conducted a hearing to determine the admissibility of the statements.

At this hearing, Officer Bowers testified that he arrived at the scene of the shooting approximately five to 10 minutes after it occurred. There were groups of people standing around, including Fowler and Towne, who had told other police officers they had seen something and had been directed to wait at the scene until officers could speak with them. Upon arrival, Bowers spent a few minutes assisting Officer Heinzel with the homicide scene. The officers agreed that Bowers would speak with Fowler and Towne while Heinzel would speak with other individuals. Bowers addressed Fowler, and then Towne. Bowers asked Towne what he had heard and seen. Bowers recalled that Towne appeared to be "nervous" and "a little visibly shaken" during the interview, but he could not recall anything specific that made him think Towne was nervous or anything else about Towne's demeanor. In response to further questioning, Bowers stated that he would not describe Towne as appearing upset.

The trial court sustained the prosecution's hearsay objection to the admission of Towne's statements. The court explained, "I don't think the fact that a witness is nervous qualifies as a spontaneous declaration . . . where the Code requires that the statement . . . 'was made spontaneously while the declarant was under the stress of excitement caused by such perception.'" The court added, "This seems to be common nervousness and nothing more. It is almost like any other witness interview in the sense that just the mere presence of a

police officer could cause somebody to become nervous. It doesn't qualify."

Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." For an out-of-court statement to fall within the spontaneous statement exception to the hearsay rule, " '(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).)

"The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker." (*People v. Farmer* (1989) 47 Cal.3d 888, 903 (*Farmer*), abrogated on other grounds by *People v. Waidla* (2000) 22 Cal.4th 690.) "A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was 'time to contrive and misrepresent[,]' " such as "the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the

time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication." (*Merriman, supra*, 60 Cal.4th at p. 64.)

"Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact." (*Poggi, supra*, 45 Cal.3d at p. 318.) We review the trial court's ruling concerning whether a hearsay statement falls within the spontaneous statement exception for abuse of discretion. (*People v. Lynch* (2010) 50 Cal.4th 693, 752 (*Lynch*), abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610.) " '[T]he discretion of the trial court is at its broadest' when it determines whether an utterance was made while the declarant was still in a state of nervous excitement." (*Thomas, supra*, 51 Cal.4th at p. 496.)

We have "rarely held" that answers to extensive questioning by police officers constitute spontaneous statements. (*Farmer, supra*, 47 Cal.3d at p. 904.) In such cases, we have emphasized that the declarant was the victim of the crime and made the identifying remarks while under the stress of excitement caused by experiencing the crime. (*Ibid.*; see also *People v. Morrison* (2004) 34 Cal.4th 698, 719 (*Morrison*).) Indeed, we held that the trial court abused its discretion when it admitted as a spontaneous utterance the statements made by the victim of an attack when her description of the crime was comprehensive, made in response to questioning, and there was no evidence that the victim "was excited or frightened when she spoke, or that her physical condition at the time of her statements precluded deliberation." (*Lynch, supra*, 50 Cal.4th at p. 754.) We also have cautioned against finding a spontaneous statement when the declarant was "merely an uninjured witness whose excitement might wane — and would

thus be in a position to fabricate answers — through the sobering interrogation of an investigator." (*Farmer*, at p. 904.)

We conclude that the trial court did not abuse its discretion when it ruled that Towne's statements to Officer Bowers did not meet the requirements of the spontaneous statement exception because the statements were not made while Towne was under the stress of excitement caused by the shooting. As noted earlier, Bowers arrived at the scene approximately five to 10 minutes after the shooting. At that time, Towne, Fowler, and other individuals were standing around in groups waiting to be interviewed by police officers. Although the extent of Towne's prior communication with other police officers is unclear, it is uncontroverted that he and Fowler had told other officers that they had seen something and were instructed to wait for further questioning. After Bowers spent a few minutes assisting Officer Heinzel with the murder scene, he spoke with Fowler separately, and then with Towne. Towne made the statements in response to Bower's questions regarding what he had seen and heard. Bowers testified that Towne appeared nervous and a little visibly shaken, but not necessarily upset, and he could not recall anything specific that made him describe Towne as nervous. Given that the discretion of the trial court " 'is at its broadest' " when it determines the declarant's mental state (*Thomas*, *supra*, 51 Cal.4th at p. 496), on this record we cannot conclude that the trial court abused its discretion when it excluded Towne's statements as inadmissible hearsay.[5]

---

[5] The cases cited by defendant do not suggest a different result, as they either involve statements made by a victim

### 5. *Exclusion of Carrillo's hearsay statements*

Defendant asserts the trial court abused its discretion when it excluded as inadmissible hearsay an out-of-court statement purportedly made by Carrillo to his sister-in-law, Alana Swift Eagle. We find no error.

Eagle was called as a defense witness. Defense counsel sought to introduce statements that Carrillo made to Eagle in 2001 when Eagle saw Carrillo on a jail bus. Specifically, Eagle asked Carrillo if he had killed Johnson, and Carrillo responded that "everything points to T-Strong" and Carrillo was "going to run with that." The prosecution objected on hearsay grounds.

---

(*Morrison*, *supra*, 34 Cal.4th at p. 719 [victim identified defendants minutes after she was shot multiple times]; *Thomas*, *supra*, 51 Cal.4th at p. 496 [victim "identified defendant minutes after he was attacked when he still was bleeding and 'obviously distressed' "]) or an uninjured eyewitness whose demeanor left no doubt that the person was still reacting to the event (*People v. Blacksher* (2011) 52 Cal.4th 769, 810 [declarant was "hysterical" when she spoke with police officer]; *People v. Brown* (2003) 31 Cal.4th 518, 541 [trial court's finding that the declarant was still reacting to the events when he made his statement to his sister-in-law was supported by evidence that "he could not stop his body from shaking nor stem the flow of tears"]). Furthermore, in each of these cases we upheld the trial court's ruling on the statements in question under an abuse of discretion standard. Even if the circumstances in which the statements were made bear certain similarities to the circumstances in which Towne made his statements, it is not incongruous to determine that the trial court here also acted within its discretion when it excluded Towne's statements. (See *People v. Liggins* (2020) 53 Cal.App.5th 55, 63–64 ["Faced with two competing interpretations of the record, the standard of review decides the issue. On appeal, we cannot second-guess the trial court's assessment of the evidence in determining [the declarant's] state of mind"].)

Defense counsel argued that Carrillo's statement was admissible as a prior inconsistent statement because he had testified during the prosecution's case-in-chief that defendant shot Johnson. The trial court excluded the statement for a variety of reasons, ruling that it constituted inadmissible hearsay, it was too ambiguous to be relevant, and its prejudicial effect outweighed its probative value.

"A hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute." (*People v. Armendariz* (1984) 37 Cal.3d 573, 585.) "Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 821.) "Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. 'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome [citation]."'" (*People v. Riggs* (2008) 44 Cal.4th 248, 290 (*Riggs*).)

"The proponent of proffered testimony has the burden of establishing its relevance, and if the testimony is comprised of hearsay, the foundational requirements for its admissibility under an exception to the hearsay rule. [Citations.] Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence." (*Morrison*, *supra*, 34 Cal.4th at p. 724.)

Notwithstanding the general rule that hearsay is inadmissible for its truth, "[a] statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770. The 'fundamental requirement' of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219, fn. omitted (*Johnson*).)

We review the trial court's rulings regarding the admissibility of the evidence for an abuse of discretion. (*Riggs*, *supra*, 44 Cal.4th at p. 290.) A trial court's decision to admit or exclude evidence " ' "will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." ' " (*People v. Nieves* (2021) 11 Cal.5th 404, 445; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) "This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise." (*Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158.)

Under this deferential standard of review, we conclude that the trial court acted within its discretion when it excluded Carrillo's statement. At trial, Carrillo testified that defendant shot Johnson. He also gave detailed testimony regarding his involvement in the events leading to the shooting. Defendant asserts that Carrillo's alleged statement to Eagle that "everything pointed to T-Strong" being the shooter and he was "going to run with that" allowed for an inference that Carrillo

himself shot Johnson, conflicting with his testimony. But the statement's ambiguity accommodates a more plausible interpretation, and one consistent with Carrillo's testimony, as another identification of defendant as Johnson's assailant. (*People v. Najera* (2006) 138 Cal.App.4th 212, 218–219; see also *People v. Guillen* (2014) 227 Cal.App.4th 934, 1024 [trial court properly excluded ambiguous statements as having little probative value, contrary to defendant's claim that the statements implied a third party authorized the attack]; *People v. Frye* (1985) 166 Cal.App.3d 941, 951.) "Facing 'two competing interpretations of the record, the standard of review decides the issue.' [Citation.] Since the evidence can reasonably be interpreted either way, we cannot say the trial court abused its discretion to rule as it did." (*People v. Roberts* (2021) 65 Cal.App.5th 469, 477.)

Moreover, "[t]he statement's ambiguity, and the weakness of the inference favorable to [defendant], not only diminished the statement's relevance, but enhanced the risk its admission would have misled the jury." (*Najera, supra*, 138 Cal.App.4th at pp. 218–219.) As such, we conclude that "[i]n excluding the statement, the trial court did not exercise its discretion ' "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Id.*, at p. 219.)

### 6. *Admission of defendant's statement to Perdon*

Defendant contends the trial court abused its discretion when it permitted Masubayashi to testify regarding Perdon's statement to him that defendant had bragged about killing Johnson, notwithstanding the hearsay character of this testimony. Again, we find no error.

Shortly before trial, District Attorney Investigator Gary Hendricks interviewed Masubayashi. During the interview, Masubayashi told Hendricks that in 2000, just before Masubayashi went to the Anaheim Police Department, Perdon advised him that defendant had told her, "I came in my pants when I saw that nigger flop." Defendant was referring to Johnson when he purportedly made this statement. Neither Masubayashi nor Perdon had disclosed this statement in any prior interview.

The trial court allowed the prosecution to ask Perdon about defendant's alleged statement to her. (See Evid. Code, § 1220 [hearsay exception for statements made by a party-opponent].) On direct examination, the prosecution asked Perdon if defendant ever spoke with her about a shooting that took place in 1997, or any shooting, or if he ever made the statement described above. Each time, Perdon responded, "I can't remember." Perdon testified that she may have seen defendant at Quiambao's house on a few occasions, but could not remember telling Masubayashi about her conversations with defendant.

The trial court found there was a reasonable basis in the record to conclude that Perdon's testimony regarding defendant's alleged statement to her was evasive and untruthful such that her prior statements would be considered inconsistent. It noted that Perdon said she did not recall whether defendant made this statement, but on other occasions she seemed to say that certain things were true. The court explained that Perdon's inability to recall whether such an inflammatory statement was made, considered in light of her ability to remember certain other things from that time period, was indicative of her being evasive and untruthful.

48

Masubayashi subsequently testified to Perdon's recounting of defendant's statement.

As noted, the " 'fundamental requirement' " of Evidence Code section 1235 is that a witness's prior statement must actually be inconsistent with his or her trial testimony. (*Johnson*, *supra*, 3 Cal.4th at p. 1219.) " ' "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement . . . ." ' " (*Cowan*, *supra*, 50 Cal.4th at p. 462.) "Thus, for example, ' "[w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 859; see also *Johnson*, at pp. 1219–1220.)

In *People v. Ledesma* (2006) 39 Cal.4th 641, 712, for example, we held that the trial court properly admitted the witness's prior statements to a police officer under the hearsay exception for prior inconsistent statements because the record provided a reasonable basis to conclude her subsequent "I don't remember" testimony was evasive and untruthful. We noted that the witness had been the defendant's friend, admitted she was reluctant to testify, had failed to appear at a previous hearing, and claimed that even reading her prior testimony and listening to a taped recording of her police interview did not refresh her recollection. (*Ibid.*; see also *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 415 [upholding trial court's ruling that witness's claimed failure of recollection was actually deliberate evasion tantamount to denial when record showed that witness was able to recall defendant's statements during a

police interview conducted 10 years after the murder, but claimed memory loss when he testified two and a half years later].)

We conclude there was a sufficient basis for the trial court to have concluded that Perdon's forgetfulness at trial was deliberately evasive, such that the court did not abuse its discretion in finding the challenged statement admissible notwithstanding the general hearsay bar. As observed earlier, Perdon and defendant's brother were friends, and she associated with other Pinoy Real gang members. She recalled spending time at Quiambao's house in 1999 and testified that she may have seen defendant there a few times and had conversations with him, but she could not remember if defendant had made the statement in question in which he bragged about shooting Johnson. The trial court, which had the benefit of observing Perdon's demeanor, could find that Perdon was deliberately evasive when she claimed not to recall whether defendant made such an inflammatory statement, while at the same time she could recollect other details associated with that time period. Accordingly, we find no error in the admission of Perdon's statement relaying defendant's confession. (See *People v. Anderson* (2018) 5 Cal.5th 372, 403 [multiple hearsay consisting of prior inconsistent statement and admission of defendant is admissible].)

### 7. *Failure to instruct concerning confessions*

Defendant contends the trial court erred by not instructing the jury with CALJIC No. 2.70, the cautionary instruction defining confessions and admissions. He claims the court's failure to instruct the jury to view with caution defendant's purported statement to Perdon in which he bragged

about shooting Johnson was prejudicial because there was evidence the statement was fabricated. We find that any error was harmless.

At the time defendant was tried, the trial court had a duty to instruct the jury with CALJIC No. 2.70 on its own motion if evidence of a defendant's oral confession or admission was presented.[6] (*People v. Stankewitz* (1990) 51 Cal.3d 72, 94; see *People v. Diaz* (2015) 60 Cal.4th 1176, 1190 (*Diaz*) [as of 2015, CALJIC No. 2.70 no longer required to be given sua sponte].) The trial court did not do so. However, the trial court did instruct the jury with CALJIC No. 2.71, the cautionary instruction defining admissions, which directed the jury to view with caution any statement of a defendant not made in court which tends to prove his guilt.[7]

---

[6] CALJIC No. 2.70 then read: "A confession is a statement made by a defendant in which [he] [she] has acknowledged [his] [her] guilt of the crime[s] for which [he] [she] is on trial. In order to constitute a confession, the statement must acknowledge participation in the crime[s] as well as the required [criminal intent] [state of mind]. [¶] An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made a confession [or an admission], and if so, whether that statement is true in whole or in part. [¶] [Evidence of [an oral confession] [or] [an oral admission] of the defendant not made in court should be viewed with caution.]"

[7] The trial court instructed the jury as follows: "An admission is a statement made by a defendant which does not by itself acknowledge his guilt of the crimes for which the defendant is on trial, but which statement tends to prove his

"We have long recognized that th[e] cautionary instruction [defining admissions] is sufficiently broad to cover all of a defendant's out-of-court statements." (*People v. Clark* (2011) 52 Cal.4th 856, 957.) Indeed, as the Attorney General points out, the only difference between the instructions was that a confession would have been defined as a statement acknowledging guilt, whereas an admission is a statement tending to establish guilt when considered with other evidence. As such, a jury would reasonably interpret "confessions" to also be admissions and apply the cautionary instruction provided. Moreover, it bears repeating that the purpose of CALJIC No. 2.70, like CALJIC No. 2.71, is "to aid the jury in evaluating whether the defendant actually made the statement." (*Diaz, supra,* 60 Cal.4th at p. 1184.) That purpose is served when the instruction advises the jurors, as it did here, that "[t]he jurors are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part," and that "[e]vidence of an oral admission of the defendant not made in court should be viewed with caution." Furthermore, the court also instructed the jury with CALJIC Nos. 2.20 (believability of a witness), 2.21.1 (discrepancies in testimony), and 2.22 (weighing conflicting testimony). These additional instructions also functioned to inform the jury how to evaluate the credibility of Masubayashi's testimony regarding defendant's statement. Accordingly, defendant fails to show

---

guilt when considered with the rest of the evidence. You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part. [¶] Evidence of an oral admission of a defendant not made in court should be viewed with caution."

prejudice resulting from the trial court's failure to give CALJIC No. 2.70.

### 8. *Use of 1996 version of CALJIC No. 8.71*

Defendant asserts the trial court's use of the 1996 version of CALJIC No. 8.71, the instruction regarding reasonable doubt concerning the degree of murder, impermissibly skewed the jury's deliberations toward first degree murder and lowered the prosecution's burden of proof. We conclude there was no error.

The jury was instructed concerning first degree murder (on theories of premeditation and lying in wait) and second degree murder (with malice aforethought but without premeditation). The jurors also were instructed that if they found defendant guilty of murder, they must determine the degree. Using the then-current version of CALJIC No. 8.71 (6th ed. 1996), the trial court further instructed the jury: "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you *unanimously* agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree as well as a verdict of not guilty of murder in the first degree." (Italics added.)

The jury was additionally instructed with CALJIC No. 17.10, which provided: "If you are not satisfied beyond a reasonable doubt that a defendant is guilty of the crime of first degree murder as charged in count I, and you unanimously so find, you may convict him of any lesser crime provided you are satisfied beyond a reasonable doubt that he is guilty of the lesser crime." The trial court also instructed the jury with CALJIC

No. 17.40: "The People and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. Do not hesitate to change an opinion if you are convinced it is wrong, however, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision. Do not decide any issue in this case by the flip of a coin, or by any other chance determination." The jury was further given CALJIC No. 8.74: "Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty; but also if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree." Additionally, the court directed the jury to read the instructions as a whole and in light of all the others, and the jury was generally instructed on reasonable doubt.

We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

In *People v. Moore* (2011) 51 Cal.4th 386, 411, we advised that "the better practice is not to use the 1996 revised versions of CALJIC Nos. 8.71 and 8.72 [relating to manslaughter], as the instructions carry at least some potential for confusing jurors about the role of their individual judgments in deciding between

first and second degree murder, and between murder and manslaughter." We declined to decide whether the giving of CALJIC No. 17.40, addressing the jurors' duty to render an individual decision, adequately dispelled the possibility of confusion, ruling instead that any error in giving the 1996 revised versions of CALJIC Nos. 8.71 and 8.72 was harmless beyond a reasonable doubt. (*Moore*, at p. 412.)

In *People v. Salazar* (2016) 63 Cal.4th 214, 246 (*Salazar*), we clarified that *Moore* did not stand for the proposition that the 1996 revised versions of CALJIC Nos. 8.71 and 8.72 were erroneous; rather, we simply observed in *Moore* that "the instructions created 'at least some potential for confusing jurors about the role of their individual judgments in deciding between' the greater and lesser offenses." (*Salazar*, at p. 247.) *Salazar* confirmed the "familiar proposition that ' "[t]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*Salazar*, at p. 248.) We subsequently concluded that the 1996 revised versions of CALJIC Nos. 8.71 and 8.72 were not erroneous when considered with the rest of the charge to the jury. (*Salazar*, at p. 248; *People v. Rivera* (2019) 7 Cal.5th 306, 326 (*Rivera*) [same].)

In *Salazar*, the jury was instructed with CALJIC Nos. 8.74 (unanimous agreement as to offense — first or second degree murder or manslaughter), 17.10 (conviction of lesser included or lesser related offense — implied acquittal), and 17.40 (individual opinion required — duty to deliberate), in addition to CALJIC Nos. 8.71 and 8.72. (*Salazar, supra*, 63 Cal.4th at p. 247.) We held that a reasonable juror, considering the instructions as a whole, would have understood the phrase " 'unanimously agree that you have a reasonable doubt' " to

"reflect the principle stated in CALJIC No. 17.10: 'the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the charged crime.' " (*Salazar*, at pp. 247–248.) We also rejected the very interpretation advanced by defendant here — that the 1996 revised version of CALJIC No. 8.71 lowered the prosecution's burden of proof by making first degree murder the default verdict. (*Salazar*, at p. 247.) We pointed out that the 1996 versions of CALJIC Nos. 8.71 and 8.72, "[i]f anything, [ ] skewed the deliberations in [a defendant's] favor. They could reasonably be understood to tell the jurors that if they all agreed there was reasonable doubt as to the degree of the crime, because some jurors were not convinced, then [a] defendant was entitled to the benefit of the doubt and a verdict of the lesser offense. No logical reading of the instructions leads to a compelled verdict of first degree murder." (*Salazar*, at p. 247.) We also emphasized that the defendant's interpretation "assumes the jury would disregard not only CALJIC Nos. 8.74 and 17.10, but also the explicit directions of CALJIC No. 17.40 emphasizing each juror's duty to decide the case as an individual." (*Salazar*, at p. 248.) More recently, we held that the use of CALJIC No. 8.71 was not erroneous, when considered in the context of the instructions as a whole, where the jury was also instructed with CALJIC Nos. 8.74 and 17.40. (*Rivera*, *supra*, 7 Cal.5th at p. 326.)

As in *Salazar*, the jury here was also instructed with CALJIC Nos. 8.74, 17.10, and 17.40. And, like in *Rivera*, there is no evidence that the jury was confused by the instruction. (*Rivera*, *supra*, 7 Cal.5th at p. 327.) Consistent with our precedent, we conclude that the trial court's use of the 1996 revised version of CALJIC No. 8.71 was not erroneous when considered with the rest of the charge to the jury and "given the

56

lack of any indication that the jury was confused or misled into returning the greater verdict of first degree murder despite a juror having a reasonable doubt of such a finding." (*Rivera*, at p. 327.) We therefore reject defendant's argument for reversal on this basis.

### 9. *Sufficiency of evidence for lying-in-wait special circumstance*

Defendant argues there was insufficient evidence to support the jury's special circumstance finding that he killed Johnson while lying in wait. We disagree.

We analyze a sufficiency-of-the-evidence challenge to a special circumstance finding under the same standard applied to a conviction: "Reviewed in the light most favorable to the judgment, the record must contain reasonable and credible evidence of solid value, 'such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Stevens* (2007) 41 Cal.4th 182, 201 (*Stevens*).)

At the time of defendant's capital crime, the special circumstance required that the murder be committed "*while lying in wait.*" (§ 190.2, former subd. (a)(15), italics added; see *People v. Streeter* (2012) 54 Cal.4th 205, 246 (*Streeter*).) Also at that time, " ' "the elements of the lying-in-wait special circumstance required an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 171.) " ' " "The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were

concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' " (*People v. Combs* (2004) 34 Cal.4th 821, 853 (*Combs*).) The period of watchful waiting " ' " need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation and deliberation." ' " (*Suarez*, at p. 171; see also *Stevens*, *supra*, 41 Cal.4th at p. 202 ["The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse"].)

We conclude that the evidence amply supports the lying-in-wait special circumstance finding. To carry out their plan to murder Johnson and Masubayashi, defendant, Lee, Chung, and Carrillo devised a scheme in which defendant and Carrillo would lure Johnson and Masubayashi from their apartment under the pretext of going out to a strip club or to shoot pool. As defendant sat in the backseat of Masubayashi's car, he was armed with a gun, waiting for an opportune time to kill Masubayashi and Johnson. Continuing the ruse of going out, defendant directed Masubayashi to stop at Chung's Jeep Cherokee, where Lee and Chung were hiding and waiting, claiming that he wanted to drive as well. After Johnson exited Masubayashi's car to let defendant out of the back seat, defendant surprised Johnson by shooting him in the head. Thus, the evidence is sufficient to establish an intentional killing, committed from a position of advantage immediately after a period of concealment and watchful waiting. (See, e.g., *Combs*, *supra*, 34 Cal.4th at p. 853 [sufficient evidence of lying in wait when the defendant devised a ruse about needing a ride to a campsite, sat behind the victim in the car, waited until the car was in a more deserted location, and then strangled her].)

### 10. Constitutionality of lying-in-wait special-circumstance instruction

Defendant asserts the lying-in-wait special-circumstance instruction violated his constitutional rights to due process, to a fundamentally fair trial, and to a reliable verdict and penalty determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.) Specifically, defendant argues that CALJIC No. 8.81.15 is unconstitutional because it does not distinguish lying-in-wait murder from premeditated and deliberate murder, and because the instruction does not require a substantial period of watchful waiting or require that the concealed purpose must be a deadly one. We have previously rejected these challenges. (*People v. Cage* (2015) 62 Cal.4th 256, 281 (*Cage*) ["As we have held before, the special circumstance of lying in wait instruction is constitutional"]; *Streeter*, *supra*, 54 Cal.4th at pp. 251–252 [same]; *People v. Bonilla* (2007) 41 Cal.4th 313, 332–333 [same].) We find no persuasive reason to deviate from our prior decisions in the present case.

### 11. Constitutionality of lying-in-wait special circumstance

Defendant further contends the lying-in-wait special circumstance itself is unconstitutional because it fails to adequately narrow the class of persons eligible for the death penalty. We have repeatedly rejected these claims (see, e.g., *People v. Delgado* (2017) 2 Cal.5th 544, 576 (*Delgado*) [lying-in-wait special circumstance does not apply to all murders and is not constitutionally infirm]; *Cage*, *supra*, 62 Cal.4th at p. 281 [same]; *Streeter*, *supra*, 54 Cal.4th at pp. 252–253 [same], and we continue to do so here for the same reasons.

### 12. *Cumulative effect of asserted guilt phase errors*

Defendant contends his convictions should be reversed because the cumulative prejudice of the alleged errors during the guilt phase violated his due process right to a fundamentally fair and reliable trial under the California and federal Constitutions. We have identified only one error occurring in the guilt phase of defendant's trial — the trial court's failure to provide the jury with the cautionary instruction defining confessions — and have found it harmless. There is no other error to accumulate.

## B. Penalty Phase and Sentencing Issues

### 1. *Refusal to allow Towne to testify at the penalty phase*

Defendant contends the trial court erred when it prohibited the defense from calling Towne as a witness during the penalty phase, resulting in a violation of his federal and state constitutional rights to due process, to a penalty determination based on all available mitigating evidence, and to a fair and reliable determination of penalty. We agree that the exclusion of Towne's testimony at the penalty phase was state law error, but find the error harmless beyond a reasonable doubt because there was no reasonable possibility that it affected the penalty verdict.

As noted in connection with defendant's argument concerning pretrial delay, the defense intended to call Towne to testify at the guilt phase of defendant's trial, but their efforts to locate him were unsuccessful.[8] Following the guilt phase

---

[8] We are not asked to decide whether defendant was prejudiced by defense counsel's failure to secure Towne's

verdicts, however, the defense successfully contacted Towne. The defense sought to have Towne testify at the penalty phase regarding his observations of the shooter, under the theory that this evidence could go to lingering doubt. When the court asked what Towne would be testifying to, recalling that perhaps he would say the shooter was short, defense counsel answered: "Well, not so much short but he was medium build. His testimony is pretty consistent with Fowler's testimony so it would be duplicating pretty much what Fowler said. And then I have Officer [Bowers] . . . available to testify in case there might be a discrepancy. I don't have the police report with me right now, but I'm certain that he would be in a position to say the shooter was not a 300-pound Samoan."

The prosecution argued that Towne's testimony was inadmissible at the penalty phase because it was merely an attempt to relitigate the issue of defendant's guilt. The trial court ruled that Towne's testimony constituted new evidence regarding the issue of guilt and excluded it on that basis. Defendant raised the issue again in his motion for new trial, which the court denied.[9]

---

appearance at the guilt phase trial, and we offer no opinion on that question.

[9] Defendant's motion for new trial included an affidavit from Towne averring, for the first time, that the shooter "definitely had a thin build" and was wearing a cap on his head. However, these added specifics were not before the trial court when it ruled on the admissibility of Towne's testimony at the penalty phase, and we therefore do not consider them in our determination of whether the court erred. (See *People v. Avila* (2004) 117 Cal.App.4th 771, 780, fn. 4 ["We review the correctness of the trial court's ruling at the time it was made

"[A] capital defendant has no federal constitutional right to have the jury consider lingering doubt in choosing the appropriate penalty . . . ." (*People v. Hamilton* (2009) 45 Cal.4th 863, 911; accord, *People v. Gay* (2008) 42 Cal.4th 1195, 1220 (*Gay*).) Admissibility of lingering doubt evidence is instead authorized by statute. (*Gay*, at p. 1220.) Pursuant to section 190.3, "[i]n the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense . . . ." In determining the penalty, the trier of fact shall consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1." (§ 190.3, factor (a).)

In *People v. Terry* (1964) 61 Cal.2d 137, 146 (*Terry*), we held that evidence that may create a lingering doubt regarding the defendant's guilt is admissible as evidence in mitigation at

_____

and not by reference to evidence produced at a later date. [Citation.] Since the [evidence was] proffered in support of defendant's new trial motion, [it is] not relevant to an assessment of the propriety of rulings that were made during trial"]; *People v. Allen* (2008) 44 Cal.4th 843, 872, fn. 19 ["To preserve a contention that evidence should have been admitted, a party's offer of proof must make clear the substance of the proffered testimony"]; *In re Zeth S.* (2003) 31 Cal.4th 396, 405 ["It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration' "].) Defendant does not challenge the court's denial of his motion for new trial, to which Towne's affidavit was attached.

a penalty phase retrial in a capital case.[10] We explained: "Indeed, the nature of the jury's function in fixing punishment underscores the importance of permitting to the defendant the opportunity of presenting his claim of innocence. The jury's task, like the historian's, must be to discover and evaluate events that have faded into the past, and no human mind can perform that function with certainty. Judges and juries must time and again reach decisions that are not free from doubt; only the most fatuous would claim the adjudication of guilt to be infallible. The lingering doubts of jurors in the guilt phase may well cast their shadows into the penalty phase and in some measure affect the nature of the punishment. Even were it desirable to insulate the psychological reactions of the jurors as to each trial, no legal dictum could compel such division, and, in any event, no statute designs it." (*Ibid.*)

We reaffirmed *Terry*'s holding in *Gay, supra,* 42 Cal.4th 1195. There, we held that the trial court erred when it excluded as irrelevant evidence proffered at a penalty phase retrial of a codefendant's out-of-court admissions that he was the sole shooter, and the corroborating testimony of four eyewitnesses. (*Id.,* at pp. 1216, 1223.) We reiterated that although "incompetent or irrelevant [evidence] is not admissible at the penalty phase," this does not "call[] into question what ' "is certainly the rule that if the evidence would have been admissible on the trial of the guilt issue, it is admissible on the trial aimed at fixing the penalty." ' " (*Id.,* at pp. 1220–1221.) We

---

[10] *Terry* involved an examination of section 190.1, a predecessor statute to section 190.3, factor (a), which also permitted "the presentation of evidence as to 'the circumstances surrounding the crime . . . and of any facts in . . . mitigation of the penalty.' " (*Terry, supra,* 61 Cal.2d at p. 146.)

emphasized: " '[T]hat the defendant cannot relitigate the issue of guilt or innocence . . . does not preclude the admission of evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate a defendant's culpability by showing that he actually did not kill the victim. The test for admissibility is not whether the evidence tends to prove the defendant did not commit the crime, but, whether it relates to the circumstances of the crime or the aggravating or mitigating circumstances.' " (*Id.*, at p. 1223, quoting *State v. Teague* (Tenn. 1995) 897 S.W.2d 248, 252.)

The Attorney General tries to distinguish *Gay* and *Terry* on the ground that those cases involved penalty retrials. He maintains that "evidence is not admissible at the penalty phase for the purpose of creating reasonable doubt," with the exception of a retrial of the penalty phase. The Attorney General misunderstands the nature of Towne's proffered testimony as well as the significance of a penalty retrial in this context.

First, Towne's proffered statement regarding the build of the shooter constituted not reasonable doubt evidence, but *lingering doubt* evidence, which is admissible under section 190.3, factor (a). Allowing the jury to consider lingering doubt evidence does not amount to an improper attempt to "relitigate the . . . conviction." (*Terry*, *supra*, 61 Cal.2d at p. 145.) Because of differing standards of proof at the two trial phases, a jury determination that the defendant is guilty beyond a reasonable doubt does not preclude a jury from entertaining lingering or residual doubt as to the nature or extent of the defendant's

guilt.[11] (*Gay*, *supra*, 42 Cal.4th at p. 1229, fn. 1 (conc. opn. of Werdegar, J.).)

Second, although both *Gay* and *Terry* involved penalty retrials, it is clear that lingering doubt evidence is relevant under section 190.3, "[w]hether in the penalty phase of a unitary trial or in a penalty retrial." (*Gay*, *supra*, 42 Cal.4th at p. 1229 (conc. opn. of Werdegar, J.); see *ibid.* ["Our holding today, although made in the context of a penalty retrial, logically applies as well to an ordinary penalty phase. What is relevant in one is equally relevant in the other"].) *People v. Blair* (2005) 36 Cal.4th 686 is illustrative. There, the prosecution offered the testimony of the defendant's former chemistry teacher at the penalty phase of a unitary trial to prove that the defendant was familiar with the dangerous properties of cyanide, which was used to kill the victim. (*Id.*, at p. 749.) We held the evidence was relevant to show "that defendant could have been the individual who placed the cyanide in the gin bottle given to [the victim and her friend], and that defendant was aware that inserting cyanide into the gin bottle could cause their deaths." (*Ibid.*) We found the evidence properly admitted under section 190.3, factor (a) as a circumstance of the crime for which the defendant was convicted or of the special circumstance which the jury found true. In so concluding, we rejected the defendant's argument "that we have placed limitations on defendants who seek to introduce, at the penalty phase, evidence relevant to issues of guilt or innocence, and that parallel limitations should be imposed on prosecution evidence." (*Blair*, at p. 749.) We observed that a defendant is not precluded

---

[11]    To the extent language in *In re Gay* (1998) 19 Cal.4th 771, 814, suggests otherwise, it is disapproved.

from introducing "any and all evidence relevant to guilt or innocence at the penalty phase. Indeed, in many circumstances evidence related to guilt or innocence, and properly designed to raise a lingering doubt, will be relevant and admissible." (*Id.*, at p. 750, citing cases.)

It is true that "in an ordinary penalty phase, tried before the same jury that recently heard and decided guilt, the defense is far less likely to offer lingering doubt evidence, and the court might legitimately exclude some offered evidence as cumulative and wasteful of court time." (*Gay*, *supra*, 42 Cal.4th at p. 1229 (conc. opn. of Werdegar, J.); *Terry*, *supra*, 61 Cal.2d at p. 146 ["If the same jury determines both guilt and penalty, the introduction of evidence as to defendant's asserted innocence is unnecessary on the penalty phase because the jury will have heard that evidence in the guilt phase"].) But "this difference in the two procedural circumstances does not affect the *relevance* of lingering doubt evidence." (*Gay*, at p. 1229 (conc. opn. of Werdegar, J.).)

Towne's testimony would have been relevant and admissible at the guilt phase, but he could not be located. And because he did not testify at the guilt phase, his testimony at the penalty phase cannot be deemed cumulative or a waste of judicial resources.[12] In short, Towne's testimony that the

---

[12] The record in this case does not suggest that the delay in presenting Towne's testimony was a result of deliberate gamesmanship or sandbagging by the defense. We therefore have no cause to comment on that issue, except to note that the trial court retains discretion to sanction *either* party for discovery violations, including by imposing the sanction of precluding witness testimony. (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1233.)

shooter had a thin or medium build, which was inconsistent with defendant's build but similar to Carrillo's build, was admissible at the penalty trial under section 190.3 as a circumstance of the offense. The trial court abused its discretion when it excluded this evidence at the penalty trial.

Nevertheless, we conclude the trial court's error was harmless under the circumstances. "Error in admitting or excluding evidence at the penalty phase of a capital trial is reversible if there is a reasonable possibility it affected the verdict." (*Gay*, *supra*, 42 Cal.4th at p. 1223.) In other words, to determine whether an error is harmless under this standard, we must decide whether it is " 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

The dissenting opinion speculates that Towne's testimony may well have played an important role in the penalty phase by providing a description of the shooter consistent with Fowler's testimony that more closely matched the build of Carrillo than that of defendant. (Dis. opn. of Liu, J., *post*, at pp. 1, 3, 5.) But based on our review of the trial record and even taking into account defendant's posttrial filings relating to Towne's proffered testimony, we can assume that Towne would have testified that for a few seconds, and from across a dark parking lot in the middle of the night, he saw a shooter of a thin or medium build with black skin wearing a cap. And given defense counsel's proffer that Towne's testimony would be "pretty consistent with Fowler's testimony so it would be duplicating pretty much what Fowler said," we can also take note that Fowler's testimony was replete with references to the poorly lit conditions and difficulty in discerning any of the shooter's

distinguishing features, including how big he was. As Fowler put it, he saw a "basic shadow." We do not find this to be the sort of eyewitness testimony that would have "appreciably weakened the case in aggravation." (Dis. opn. of Liu, J., *post*, at p. 7.)

It also bears noting that the dissent places heavy reliance only on certain details extracted from defendant's motion for new trial. (Dis. opn. of Liu, J., *post*, at pp. 1, 3, 5.) The dissent discounts, for example, the defense investigator's affidavit attached to that motion declaring that Towne described the color of the shooter's skin as black, a description *inconsistent* with Carrillo's skin color and more closely matching that of defendant. Thus, although Towne's and Fowler's testimony regarding the shooter's build may have stood in contrast to that of Rodriguez, the third eyewitness at the Gateway Clinic, who testified that the shooter was heavyset, Towne's statement that the skin color of the shooter was black, which lined up with Rodriguez's initial statement to police officers and Fowler's subsequent interview with defense investigators, would have pointed away from Carrillo and toward defendant.

In any event, this evidence pales in comparison to the evidence at the guilt phase, properly considered at the penalty phase as circumstances of the case, establishing defendant's guilt. To recap: Masubayashi and Carrillo, both of whom knew defendant and were with him when the shooting took place, identified defendant as the shooter. Masubayashi testified that he had observed defendant carrying a gun on the night in question, saw defendant exit Masubayashi's car, shoot and kill Johnson, and then reach into the car and shoot Masubayashi. Carrillo testified that he was with defendant when defendant communicated his plan to kill Johnson and Masubayashi, he

accompanied defendant to Johnson and Masubayashi's apartment with the intent to lure them out and kill them, he saw defendant tuck a gun in his waistband before they set out for the evening, and he watched defendant shoot Johnson and Masubayashi. Sia Her also testified that defendant told her he was "strapped" that night. Masubayashi, Carrillo, and defendant testified that defendant was carrying a .357 magnum handgun, which was one of two possible guns identified as firing the bullet that killed Johnson. Quiambao testified that, after the shooting took place, Carrillo returned to his apartment and told him that defendant shot Johnson. And when defendant arrived at Quiambao's house, he did not respond to Quiambao's question asking why he shot Johnson and Masubayashi. Instead, when pressed, defendant told Quiambao to "shut the hell up." Defendant also admitted to Quiambao that he threw the gun away. The dissenting opinion ignores the weight of the testimony from Carrillo and Masubayashi, both of whom the jury found credible, and downplays the inculpatory testimony of Quiambao and Her.

Moreover, beyond the circumstances of the crime, which involved the murder of Johnson by means of lying in wait and the attempted murder of Masubayashi, the prosecution presented penalty phase evidence of defendant's sexual misconduct and two prior robberies and the testimony from several of Johnson's family members and friends regarding the pain and suffering caused by Johnson's death.

Significantly, defendant's penalty phase evidence focused not on lingering doubt, but on defendant's family history, background and character, brain activity, and adjustment to prison as factors in mitigation. Defense counsel's closing argument referenced lingering doubt only briefly, conjecturing

that perhaps Carrillo would admit on his death bed that he was the shooter, but he did not mention Fowler's testimony or any other details suggesting that defendant was not the shooter. Thus, to the extent that Towne's testimony, if admitted, might have gone to the issue of lingering doubt, defense counsel's failure to raise the issue even given Fowler's admitted testimony — which was essentially the same as Towne's excluded testimony — serves to further underscore the inconsequential nature of the error. Moreover, the trial court properly instructed the jury on lingering doubt, and the jury reached a verdict only a few hours after beginning their deliberations.

In light of these circumstances, we conclude there is no reasonable possibility that the additional testimony defendant could have elicited from Towne would have affected the jury's verdict at the penalty phase.

### 2. *Instruction on deliberations with alternate juror substituted at penalty phase*

Following the guilt phase verdicts, the trial court excused one of the seated jurors, who was replaced with an alternate juror for the penalty phase. Defendant claims the trial court's special instruction requiring the penalty phase jury to accept the guilt phase verdicts and findings violated his state and federal constitutional rights to a fair trial, due process, and a reliable determination of penalty.

The trial court instructed the penalty phase jury that "[f]or the purposes of this penalty phase of the trial, the alternate juror must accept as having been proved beyond a reasonable doubt those guilty verdicts and true findings rendered by the jury in the guilt phase of this trial." The court also instructed

the jury that "if any individual juror has a lingering or residual doubt about whether the defendant killed the victim, he or she must consider it as a mitigating factor and assign to it the weight you deem appropriate."

We have on numerous occasions considered and rejected the argument that this special instruction is constitutionally defective. (See, e.g., *People v. Cain* (1995) 10 Cal.4th 1, 64–66 (*Cain*); *id.*, at p. 67 ["An instruction that allows the jurors to vote against the death penalty phase if they have residual doubt as to guilt or truth of the special circumstances is sufficient even though it requires the [alternate] jurors to accept the guilt phase verdicts"].) Most recently, in *People v. Miles* (2020) 9 Cal.5th 513, 604, we stated: "We have made clear that '[a]s a matter of law, the penalty phase jury must conclusively accept [the guilt phase jury's] findings' as to the defendant's guilt and the truth of the special circumstance allegations beyond a reasonable doubt. [Citation.] We have also rejected the suggestion 'that anytime a juror is replaced at the penalty phase, the jury should engage in guilt phase deliberations anew.' [Citation.] And, most notably, in *People v. Cain*[ ], we found no constitutional defect in the trial court instructing the jury, including a new juror who replaced an excused juror, that it must accept the guilt phase verdicts and findings at the penalty phase." We also reiterated in *Miles* that an instruction regarding lingering doubt as a mitigating factor sufficiently apprises alternate jurors that they may vote against the death penalty if they doubt the defendant's guilt. (*Miles*, at p. 604, citing *People v. Kaurish* (1990) 52 Cal.3d 648, 708; see also *Cain*, at p. 67; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1089 ["There is no reason to think that the jurors would have interpreted the instructions to permit only the original jurors, and not the former alternate jurors, to

consider lingering doubt"].)  Defendant offers no reasoned basis for us to reconsider our previously expressed view.

### 3. *Admission of juvenile criminal history*

Defendant asserts the jury's consideration of his juvenile criminal history violated his federal constitutional rights under the Eighth and Fourteenth Amendments.  He contends that recent United States Supreme Court decisions applying the Eighth Amendment to juveniles undercuts the use of juvenile criminal activity as an aggravating factor in determining whether to impose a death sentence.  We conclude otherwise.

During the penalty phase, the prosecution presented evidence that when defendant was 13 years old, he exposed himself to two female students and touched their buttocks and breasts.  The prosecution also presented evidence that defendant robbed and assaulted Thomas Kinsey when defendant was age 16.

Juvenile criminal activity involving the use or attempted use of force or violence is admissible as aggravating evidence under section 190.3, factor (b).  (*People v. Taylor* (2010) 48 Cal.4th 574, 652.)  We have repeatedly held that the admission of such evidence is constitutional.  (E.g., *People v. Lee* (2011) 51 Cal.4th 620, 649; *People v. Raley* (1992) 2 Cal.4th 870, 909.)

In *People v. Bramit* (2009) 46 Cal.4th 1221, 1239 (*Bramit*), we examined and rejected the defendant's claim that, in light of the United States Supreme Court's decision in *Roper v. Simmons* (2005) 543 U.S. 551, the admission of juvenile criminal activity violates the Eighth and Fourteenth Amendments.  We concluded the defendant's reliance on *Roper* was "badly misplaced," explaining that *Roper* "holds that the execution of

individuals who were under 18 years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments. It says nothing about the propriety of permitting a capital jury, trying an adult, to consider evidence of violent offenses committed when the defendant was a juvenile. An Eighth Amendment analysis hinges upon whether there is a national consensus in this country against a particular punishment. [Citations.] Defendant's challenge here is to the admissibility of evidence, not the imposition of punishment." (*Bramit*, at p. 1239; see also *Taylor, supra*, 48 Cal.4th at pp. 653–654 [same].)

We have further held that three additional high court decisions — *Hall v. Florida* (2014) 572 U.S. 701, *Miller v. Alabama* (2012) 567 U.S. 460, and *Graham v. Florida* (2010) 560 U.S. 48 — do not alter our conclusion that evidence of juvenile misconduct may be considered on the question of what punishment a defendant may receive for crimes committed as an adult. (*Rivera, supra*, 7 Cal.5th at pp. 342–343; *People v. Rices* (2017) 4 Cal.5th 49, 87.) In *Rices*, we observed that "[t]he high court has never suggested that evidence of juvenile misconduct may not be admitted in deciding the proper punishment for crimes an adult commits" and, furthermore, "[n]o legal principle prohibits admitting evidence of [an adult's] violent juvenile conduct on the question of what the punishment for those crimes should be." (*Rices*, at p. 87.) Consistent with our prior precedent, we conclude the jury's consideration of defendant's juvenile criminal activity as an aggravating factor under section 190.3, factor (b), was permissible.

## *4. Admission of evidence of unadjudicated robbery*

Defendant maintains that the trial court committed prejudicial error when it failed to instruct the jury on aiding and abetting liability after the prosecution presented evidence that defendant robbed Kinsey as an aider and abettor. We conclude that any error was harmless.

At the penalty phase, the prosecution sought to introduce evidence under section 190.3, factor (b) that defendant and three other individuals robbed Kinsey in 1991. Section 190.3, factor (b) allows the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." The trial court held a *Phillips* hearing (*People v. Phillips* (1985) 41 Cal.3d 29) to make a preliminary determination concerning whether there was substantial evidence to prove that defendant robbed Kinsey. The court subsequently ruled that the evidence fit within section 190.3, factor (b) as criminal activity involving the use or attempted use of force or violence and would be admissible under that provision. Defendant did not object to the trial court's ruling.

The prosecution subsequently presented the following evidence regarding defendant's participation in the robbery of Kinsey: Defendant and three other individuals approached Kinsey when he was walking in Hollywood. Defendant moved toward Kinsey, commenting on Kinsey's briefcase. One of the other individuals grabbed Kinsey's briefcase and fled. Defendant then pushed Kinsey and demanded money from him. As defendant approached Kinsey, he said, "I'm going to fuck you up." Defendant also pulled his fist back as if to punch Kinsey.

A patrolling officer saw three men, including defendant, cornering and pushing Kinsey. The officer approached the group, ordered everyone on the ground, and interviewed the individuals to determine what had occurred. Kinsey told the officer that defendant had asked Kinsey for more money, pushed Kinsey, and pulled his arm back as if to punch Kinsey.

The trial court instructed the jury that in determining which penalty to impose, if applicable, it shall consider "the presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." The court further instructed the jury that evidence was introduced for the purpose of showing that defendant committed a second degree robbery against Kinsey, and that in order for a juror to consider the robbery of Kinsey as an aggravating circumstance, the juror must find beyond a reasonable doubt that defendant did in fact commit the criminal activity. The court also instructed the jury on the elements of robbery. It further instructed: "For the purpose of determining whether a person is guilty as an aider or abettor to robbery, the commission of the crime of robbery is not confined to a fixed place or a limited period of time, and may continue[] so long as the stolen property is being carried away to a place of temporary safety."

Defendant contends the evidence supported a finding of his involvement in Kinsey's robbery as an aider and abettor only, and therefore the trial court should have provided CALJIC Nos. 3.00 and 3.01, which describe the essential elements of aider and abettor liability. Defendant maintains that without such an instruction, the prosecution could proceed only on a

direct perpetrator theory of liability for the robbery of Kinsey, and the evidence was insufficient as a matter of law to show that defendant robbed Kinsey as a direct perpetrator.

We conclude that defendant has forfeited his claim on appeal by failing to object at trial to admission of other crimes evidence on the ground it did not meet section 190.3, factor (b)'s criteria. (See, e.g., *Delgado, supra,* 2 Cal.5th at p. 580; *People v. Livingston* (2012) 53 Cal.4th 1145, 1175 (*Livingston*); *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1052; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1059–1060.) In *Livingston,* the defendant contended that certain evidence in aggravation should not have been admitted under section 190.3, factor (b) because the evidence was insufficient for a jury to conclude that he was guilty of a crime involving violence. We held that this argument was not cognizable on appeal because defendant did not object to the evidence on this basis at trial. (*Livingston,* at p. 1175.) This was so, we explained, because the evidence was admitted at the penalty phase of a capital trial as aggravating evidence, not to support a conviction for that crime. (*Ibid.*) " 'Even if defendant need do nothing at trial to preserve an appellate claim that evidence supporting his *conviction* is legally insufficient, a different rule is appropriate for evidence presented at the penalty phase of a capital trial. There the ultimate issue is the appropriate punishment for the capital crime, and evidence on that issue may *include* one or more other discrete criminal incidents. [Citation.] If the accused thinks evidence on any such discrete crime is too insubstantial for jury consideration, he should be obliged in general terms to object, or to move to exclude or strike the evidence, on that ground.' " (*Ibid.*)

We recently reaffirmed this principle in *Delgado*, explaining that "because the penalty decision is normative and the prosecution need not prove that any given aggravating circumstance exists in order to obtain a death judgment [citation], [a] defendant may not challenge the verdict on the ground that the prosecutor failed to prove each of the elements of an uncharged offense beyond a reasonable doubt. His claim of error lies in the erroneous *admission* of such evidence; that claim must be preserved by a timely objection in the trial court." (*Delgado*, *supra*, 2 Cal.5th at p. 581.)

Here, as in *Livingston* and *Delgado*, defendant's challenge on appeal is directed to the sufficiency of evidence admitted at the penalty phase of a capital trial as aggravating evidence. (*Livingston*, *supra*, 53 Cal.4th at p. 1175; *Delgado*, *supra*, 2 Cal.5th at p. 581.) Defendant " 'should be obliged in general terms to object, or to move to exclude or strike the evidence, on that ground.' " (*Livingston*, at p. 1175.) Defendant's failure to raise such an objection at trial constitutes a forfeiture.

Although defendant has forfeited his claim, we also reject it on the merits. "Although specific instruction on the elements of other crimes introduced in aggravation under section 190.3, factor (b) is generally not required" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1154 (*Gutierrez*)), " 'when such instructions are given, they should be accurate and complete' " (*People v. Prieto* (2003) 30 Cal.4th 226, 268 (*Prieto*)). We find the trial court's failure to instruct the jury on aider and abettor liability as it related to the robbery of Kinsey was harmless beyond a reasonable doubt because, despite any misinstruction, the evidence overwhelmingly showed that defendant committed an act involving the use or threat of use of force or violence under section 190.3, factor (b).

*Gutierrez* and *Prieto* are instructive in this respect. In *Gutierrez*, the prosecution sought to introduce as a crime in aggravation under section 190.3, factor (b), that defendant resisted, by the use of force or violence, an executive officer in the performance of that officer's duty in violation of section 69. (*Gutierrez*, *supra*, 28 Cal.4th at pp. 1153–1154.) Although a violation of section 69 requires a specific intent to interfere with the executive officer's performance of duty, the trial court provided an instruction on general criminal intent. (*Gutierrez*, at p. 1154.) Nevertheless, we found the error was "clearly harmless beyond a reasonable doubt" because "[t]here was evidence that defendant harbored the requisite specific intent." (*Ibid.*) Similarly, in *Prieto*, the prosecution alleged in aggravation that the defendant possessed deadly weapons while in jail in violation of section 4574. (*Prieto*, *supra*, 30 Cal.4th at p. 269.) The defendant asserted the trial court's instruction on section 4574 was deficient because it did not require the jury to find that he knew of the weapon's presence and its nature as a deadly weapon. (*Ibid.*) The defendant admitted he possessed the weapons — two half-foot-long shanks with sharpened ends hidden under the defendant's bunk — for protection, and offered no evidence suggesting that he did not know of the weapons' presence in his cell and their nature as deadly weapons. (*Ibid.*) We held that any instructional error was harmless beyond a reasonable doubt. (*Ibid.*)

In the present case, even assuming a deficiency in the instructions, the evidence pointed unerringly toward defendant's culpability in the commission of the robbery of Kinsey as an aider and abettor. Defendant approached Kinsey with three other individuals, one of whom grabbed Kinsey's briefcase and fled. Defendant pushed Kinsey, threatened to

"fuck [Kinsey] up," pulled back his fist as if he was going to punch Kinsey, and demanded more money from him. Given the overwhelming evidence, there is no reasonable possibility that the trial court's failure to instruct on aider and abettor liability would have affected the jury's penalty deliberations. Defendant does not contend that the evidence would be insufficient to support a finding that he committed the robbery of Kinsey as an aider and abettor, nor does he claim that the criminal activity did not involve the use of force or violence or the express threat to use violence. (See *Cain*, *supra*, 10 Cal.4th at p. 73 [proper focus for consideration of prior violent crimes in aggravation is on the facts of the defendant's past actions as they reflect on his character, not the labels assigned to the past crimes; accordingly, the instructions were not essential to the jury's consideration of crimes in aggravation under section 190.3, factor (b)].) And that evidence notwithstanding, we see no reasonable possibility that defendant would have obtained a more favorable outcome if the aider and abettor instruction had been given, in light of the great weight of the aggravating evidence against him.

### 5. *Challenges to California's death penalty law*

Defendant challenges the constitutionality of numerous features of California's capital sentencing scheme. We have repeatedly considered and rejected such challenges, and defendant offers no persuasive reason for us to reconsider the following conclusions:

"Section 190.3, factor (a), under which the jury may consider the 'circumstances of the crime' as a factor in aggravation or mitigation of penalty, is not so broad as to make imposition of a death sentence arbitrary and capricious."

(*People v. Souza* (2012) 54 Cal.4th 90, 141–142; *People v. Brown* (2004) 33 Cal.4th 382, 401.)

"The death penalty scheme is not unconstitutional for failing to require . . . findings beyond a reasonable doubt as to the existence of aggravating factors other than section 190.3, factors (b) and (c), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty." (*People v. Leon* (2020) 8 Cal.5th 831, 853.) The United States Supreme Court's decisions in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington*, *supra*, 542 U.S. 296, *Ring v. Arizona*, *supra*, 536 U.S. 584, and *Apprendi v. New Jersey*, *supra*, 530 U.S. 466 do not alter these conclusions. (*Bramit*, *supra*, 46 Cal.4th at p. 1250 & fn. 22.)

"Because the decision whether to sentence a defendant to death is essentially a normative one, we have held the prosecution bears no burden of persuasion in the penalty phase." (*People v. Virgil* (2011) 51 Cal.4th 1210, 1289.) "Nor does the federal or state Constitution require an instruction explaining that there is no burden of proof in the penalty phase." (*Ibid.*)

"The death penalty law is not unconstitutional because it does not require unanimous jury findings, beyond a reasonable doubt, that particular aggravating factors (other than prior criminality) exist." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 928; *People v. McDaniel* (2021) 12 Cal.5th 97, 142–148.)

"CALJIC No. 8.88 is not constitutionally flawed or impermissibly vague because (1) it uses the phrase 'so substantial' to compare aggravating factors with the mitigating factors [citations]; (2) it uses the term 'warrants' instead of appropriate' [citations]; (3) it fails to instruct the jury that a life

sentence is mandatory if the aggravating factors do not outweigh the mitigating factors [citations]; [and] (4) it fails to instruct that a verdict of life in prison could be returned even if the circumstances in aggravation outweighed those in mitigation." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1179.)

"[T]he death penalty law is constitutional though it . . . does not require that the jury be instructed on the presumption of life." (*People v. Jones* (2003) 29 Cal.4th 1229, 1267, italics omitted.)

"The trial court has no obligation to delete from CALJIC No. 8.85 inapplicable mitigating [or aggravating] factors." (*People v. Cook* (2006) 39 Cal.4th 566, 618.)

"[T]here is no Eighth Amendment requirement that our death penalty procedures provide for intercase proportionality review." (*People v. Navarro* (2021) 12 Cal.5th 285, 346; *People v. Snow* (2003) 30 Cal.4th 43, 126.)

"The capital sentencing scheme does not violate equal protection by denying certain procedural protections to capital defendants that are available to noncapital defendants." (*People v. Scully* (2021) 11 Cal.5th 542, 612; *People v. Molano* (2019) 7 Cal.5th 620, 678.)

"California's death penalty does not violate international law or international norms of decency." (*People v. Frederickson* (2020) 8 Cal.5th 963, 1027; *People v. Powell* (2018) 5 Cal.5th 921, 965.)

Because defendant has not demonstrated any basis for this court to find error in California's death penalty laws, there is no reason to conclude that the cumulative impact of the alleged deficiencies in California's death penalty scheme renders it constitutionally infirm. (*People v. Williams* (2013)

58 Cal.4th 197, 296; *People v. Garcia* (2011) 52 Cal.4th 706, 756.)

### 6. *Cumulative effect of asserted guilt and penalty phase errors*

Defendant contends that the penalty judgment must be reversed due to the cumulative prejudice of the alleged errors committed during the guilt and penalty phases in violation of his due process right to a fundamentally fair and reliable trial under the California and federal Constitutions. We have found one harmless error in the guilt phase: the trial court's failure to instruct the jury on confessions in addition to admissions. We have found or assumed two errors, but no prejudice, in the penalty phase: the trial court's exclusion of Towne's testimony as evidence of lingering doubt under section 190.3, and the court's failure to instruct on aider and abettor liability after the prosecution presented evidence pursuant to section 190.3, factor (b) that defendant committed second degree robbery as an aider and abettor. We conclude that the cumulative effect of these errors does not warrant reversal of the penalty judgment. (*People v. Johnson* (2019) 8 Cal.5th 475, 525; *People v. Panah* (2005) 35 Cal.4th 395, 479–480.)

## C. Newly Conferred Discretion Concerning the Firearm and Serious Felony Enhancements

Defendant contends that certain ameliorative legislation, enacted after he was sentenced, applies retroactively to his case and that a limited remand is appropriate to allow the trial court to consider its newly conferred sentencing discretion. We agree.

On January 1, 2018, Senate Bill No. 620 (2017–2018 Reg. Sess.) became effective. (Stats. 2017, ch. 682, §§ 1, 2.) The bill vested courts with authority to exercise their discretion to strike

or dismiss firearm enhancements imposed under section 12022.5 (see § 12022.5, subd. (c)). Prior to the enactment of Senate Bill No. 620, these enhancements were mandatory. (§ 12022.5, former subd. (c).)

On January 1, 2019, Senate Bill No. 1393 (2017–2018 Reg. Sess.) became effective. (See Stats. 2018, ch. 1013, §§ 1, 2.) This legislation amended sections 667, subdivision (a) and 1385, subdivision (b) to permit a trial court to exercise discretion to strike or dismiss prior serious felony enhancements "in the furtherance of justice." (See Stats. 2018, ch. 1013, §§ 1, 2.) At the time defendant was sentenced, the trial court was required under section 667, subdivision (a), to enhance the sentence imposed for conviction of a serious felony by five years for each qualifying prior serious felony conviction.

The Attorney General agrees that Senate Bill No. 620 (2017–2018 Reg. Sess.) and Senate Bill No. 1393 (2017–2018 Reg. Sess.) apply retroactively to defendant's case, but maintains that a remand is unnecessary because the trial court indicated an intent not to strike the enhancements. The Attorney General argues that remand for resentencing is unwarranted because the trial court's statements and sentencing choices suggest that it would not have exercised its discretion to dismiss the enhancements.

Based on our review of the record, we do not glean a clear indication that the trial court, when it originally sentenced defendant, would not have stricken the enhancements. (See, e.g., *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) Thus, we agree that a limited remand is appropriate under the circumstances for the sole purpose of allowing the trial court to

consider whether to exercise its newly conferred discretion and strike the enhancements.

## III. DISPOSITION

The judgment is affirmed in its entirety. The matter is remanded for the trial court to consider whether to strike the prior serious felony enhancement under section 667, subdivision (a) and the firearm enhancements under section 12022.5, subdivision (a), and thereafter to amend the abstract of judgment accordingly.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CORRIGAN, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

PEOPLE v. MATAELE

S138052


Concurring Opinion by Justice Groban


I concur fully with the majority, but write separately to expand on the majority's observation that "[w]e are not asked to decide whether defendant was prejudiced by defense counsel's failure to secure [eyewitness Matthew] Towne's appearance at the guilt phase trial[.]" (Maj. opn., *ante*, at pp. 60–61, fn. 8.) As described more fully below, I believe a habeas corpus proceeding would be the appropriate forum to explore such a claim.

Defendant Tupoutoe Mataele contends that Towne's testimony would have been valuable to his defense. "According to defense counsel's offers of proof made at the guilt and penalty phases . . . , Towne would have testified that he saw a shooter with a thin build in the parking lot across the street. At the time of the shooting, defendant weighed more than 300 pounds; [Ryan] Carrillo was closer to 160 pounds." (Maj. opn., *ante*, at p. 37.) This testimony would have been consistent with eyewitness John Fowler's trial testimony; Fowler described the shooter as having a thin-to-medium build and being about 5 feet 10 inches. Like Fowler, Towne was a disinterested third-party eyewitness. As the majority recognizes, "Towne's testimony would have been relevant and admissible at the guilt phase, but he could not be located." (Maj. opn., *ante*, at p. 66.)

But defense counsel made a decision that did not work out well for his client. Counsel decided not to legally compel Towne's appearance at trial, and instead relied on Towne's voluntary

1

appearance.[1]  When trial commenced and counsel could not locate Towne, the trial court afforded defense counsel some time to secure Towne's appearance at trial, but ultimately declined "to delay the trial anymore to try to get a witness in here who may never appear before the court."  As such, Towne's testimony was not presented to the jury during the guilt phase of Mataele's trial.  While the defense located Towne before the penalty phase, the trial court precluded Towne from testifying on the basis that his testimony constituted new evidence on the issue of guilt. (Maj. opn., *ante*, at p. 61.)

"As we have observed in the past, certain practical constraints make it more difficult to address ineffective

---

[1]  In seeking a mid-trial continuance, defense counsel presented testimony from Defense Investigator David Carpenter, who described for the trial court his efforts to locate Towne.  In so doing, Carpenter explained in part, "[w]e didn't subpoena Mr. Towne because Mr. Towne was at all times friendly.  California subpoena in Nevada is worthless.  It was the suggestion to [defense counsel] that we not go through the interstate compact that would serve to alienate him.  I didn't feel it was appropriate and a waste of time."  The "interstate compact" referred to by Carpenter is more formally known as the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases ("the Act").  (See Pen. Code, § 1334.)  The California Legislature adopted the Act in 1937, with slight modifications, as sections 1334 to 1334.6 of the Penal Code.  (See *People v. Cavanaugh* (1968) 69 Cal.2d 262, 266.)  The Act has now been adopted in all fifty states, plus the District of Columbia, Puerto Rico, and the Virgin Islands.  (Studnicki & Apol, *Witness Detention and Intimidation:  The History and Future of Material Witness Law* (2002) 76 St. John's L.Rev. 483, 532.)  It permits a court to order that a material witness in a criminal prosecution be taken into custody in another state and delivered to the court to ensure the witness's attendance at trial. (Pen. Code, §§ 1334–1334.6.)

assistance claims on direct appeal rather than in the context of a habeas corpus proceeding.   [Citations.]  The record on appeal may not explain why counsel chose to act as he or she did." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).) Perhaps for this reason, Mataele's appellate counsel does not ask us here to consider whether trial counsel was ineffective.

In order to make a showing of ineffective assistance of counsel, a defendant must satisfy the two-prong standard under *Strickland v. Washington* (1984) 466 U.S. 668.  First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." (*Id.* at p. 688.) Second, the court asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694; see also *People v. Johnson* (2016) 62 Cal.4th 600, 653.)

As to the question of deficient performance, we do not have the benefit of a declaration from defense counsel, but notably, in moving for a new trial, counsel argued that "a new trial should be granted in the guilt phase based on Matt Towne's expected testimony."  He tried to characterize Towne's expected testimony as "newly discovered evidence" and asserted in part, "[a]ssuming arguendo a lack of due diligence in discovering the evidence presented at the motion for a new trial, this lack of due diligence cannot justify a denial of the new trial motion where the newly discovered evidence would probably lead to a different result at trial.  If a trial court determines that a defendant did not have a fair trial on the merits and that by reason of the newly discovered evidence the result could reasonably and probably be different on retrial, it should not seek to sustain an erroneous judgment imposing

criminal penalties on the defendant as a way of punishing defense counsel's lack of diligence."

I take no view on the reasonableness of trial counsel's actions. (Cf. *People v. Sanders* (1995) 11 Cal.4th 475, 523 [considering the phrase "reasonable diligence" within the meaning of Evidence Code, section 240, subdivision (a)(5) and explaining, " '[w]hat constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case. [Citation.] The term is incapable of a mechanical definition' "].)

Similarly, I take no position on whether Mataele was prejudiced by any potential ineffectiveness by trial counsel. Again, "[w]e are not asked to decide whether defendant was prejudiced by defense counsel's failure to secure Towne's appearance at the guilt phase trial[.]" (Maj. opn., *ante*, at pp. 60–61, fn. 8.) The question of counsel's ineffectiveness at the guilt phase, and any prejudice therefrom, poses a distinct question from the question debated by the majority and the dissent, i.e., whether Mataele was prejudiced by the trial court's erroneous exclusion of Towne's testimony at the penalty phase.

On habeas corpus, a petitioner provides a court with "reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) Mataele can provide sworn declarations as to why defense counsel did not use legal process to secure Towne's testimony at the guilt phase. Similarly, additional evidence, including declarations, might further illuminate exactly what

Towne would have testified to and if it would have been helpful to the defense at guilt.  Moreover, if an order to show cause issues, the court may conduct an evidentiary hearing and hear directly from relevant witnesses, including (if they are available) Mataele's trial counsel, Mataele's investigator (Carpenter) and, most significantly, Towne himself.  (*In re Figueroa* (2018) 4 Cal.5th 576, 587) [if "the court conclude[s] there are factual issues in dispute, 'it may appoint a referee and order an evidentiary hearing' "].)  In sum, this is a highly fact-specific inquiry that will benefit from additional argument and evidence that is not part of the record before us on direct appeal.  This is precisely what a habeas corpus proceeding is best suited for.  (Cf. *Mickel, supra*, 2 Cal.5th at p. 198.)


**GROBAN, J.**

PEOPLE v. MATAELE

S138052


Concurring and Dissenting Opinion by Justice Liu


Defendant Tupoutoe Mataele was sentenced to death by a jury wrongly prevented from hearing testimony from an eyewitness who would have described the shooter in a manner inconsistent with Mataele's size.  As today's opinion holds, the trial court erred in excluding this testimony in the penalty phase.  (Maj. opn., *ante*, at p. 67.)  But I cannot agree with today's further holding that the error was harmless.  In the circumstances here, I believe the error was of the sort that "may have led a single juror to vote for the death penalty, who, if the error had not occurred, would not have done so." (*People v. Terry* (1964) 61 Cal.2d 137, 153 (*Terry*).)

Mataele weighed 300 to 350 pounds at the time of the shooting.  Eyewitness Matthew Towne would have described the shooter to the jury as a male wearing a cap who "definitely had a thin build" and was around 160 to 170 pounds, "definitely not anywhere near 300 pounds."  Ryan Carrillo, who accepted a six-year plea deal to testify against Mataele, and whom the defense argued was the actual shooter, weighed 145 pounds and admitted to wearing a cap the night of the shooting.

The prosecution's case against Mataele rested on Carrillo's immunized testimony and John Masubayashi's limited view of the shooter's forearm.  Towne's testimony would have matched the description provided by another eyewitness, John Fowler, who described the shooter as a man half the size of Mataele.  In

1

my view, "there is a reasonable possibility" that Towne's testimony would have been sufficient to create a lingering doubt about the shooter's identity and thereby cause one or more jurors to select a different penalty. (*People v. Gay* (2008) 42 Cal.4th 1195, 1227 (*Gay*).) Under the applicable standard of review, the death verdict cannot stand.

A penalty phase error requires reversal if " 'there is a reasonable possibility such an error affected a verdict.' " (*People v. Nelson* (2011) 51 Cal.4th 198, 218, fn. 15, italics omitted.) This standard " 'is the same, in substance and effect, as the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24.' " (*Ibid.*, italics omitted.) It is not satisfied so long as there is a doubt "based upon 'reason.' " (*Jackson v. Virginia* (1979) 443 U.S. 307, 317.) A "reviewing court making this harmless-error inquiry" must not " 'become in effect a second jury.' " (*Neder v. United States* (1999) 527 U.S. 1, 19.) We ask only whether absence of the error "could rationally lead to a contrary finding." (*Ibid.*) This stringent standard serves to ensure " 'reliability in the determination that death is the appropriate punishment in a specific case.' " (*People v. Brown* (1988) 46 Cal.3d 432, 448.) "Anything less [than the *Chapman* standard] would force a reviewing court to run a constitutionally unacceptable risk of affirming a judgment against a human being for whom death may not be the appropriate penalty." (*Id.* at p. 470 (conc. opn. of Mosk, J.).)

Today's opinion discounts Towne's testimony because he saw the shooter for only a few seconds across a dark parking lot. It states that because defense counsel proffered that Towne's testimony would be " 'pretty consistent with Fowler's testimony . . . ,' we can also take note that Fowler's testimony was replete with references to the poorly lit conditions and difficulty in

discerning any of the shooter's distinguishing features, including how big he was. As Fowler put it, he saw a 'basic shadow.' " (Maj. opn., *ante*, at pp. 67–68.) But Fowler repeatedly testified that he was "sure" the shooter was not 300 pounds and that the shooter did not approach the size of Mataele. And, as Towne indicated in a declaration, Towne was prepared to testify that the shooter was a 5' 8" to 6" tall male who "definitely had a thin build" and "was definitely not anywhere near 300 pounds."

Beyond having obvious "exculpatory value" standing on its own, as the Attorney General's briefing concedes, Towne's testimony would have served an important role in relation to the other eyewitness testimony. The only third party eyewitnesses were Towne, Fowler, and Jose Rodriguez. At the scene, Rodriguez told police that the shooter was of "medium" build. At trial, he testified that the shooter was "kind of maybe heavyset" based on the baggy clothes he observed, but that his recollection would have been better at the scene and that if there was a discrepancy, he would go with what he initially told police. Fowler initially described the shooter as having thin build and wearing a cap. At trial, he maintained that the shooter had thin-to-medium build and wore a beanie.

Towne's testimony that the shooter had thin build would have reinforced Fowler's testimony and lent credence to Rodriguez's statements at the scene. Towne's testimony would have broken any perceived tie between Rodriguez's testimony and Fowler's testimony about the shooter's size and would have supported Fowler's testimony that the shooter was wearing a hat (Rodriguez could not recall whether the shooter was wearing a hat). The fact that each eyewitness observed the shooter in poor lighting conditions made the fact that Towne's testimony

corroborated Fowler's of even greater value. The prosecutor recognized the consequential nature of Fowler's testimony for the defense, emphasizing his cross-examination of Fowler in closing argument. A second, disinterested eyewitness providing the same description of the shooter in the parking lot inconsistent with Mataele's physical appearance would have more strongly countered the prosecution's case than Fowler's testimony alone.

The court notes that a defense investigator's affidavit stated that Towne described the shooter to him as Black, "which lined up with Rodriguez's initial statement to police officers and Fowler's subsequent interview with defense investigators" and "would have pointed away from Carrillo and toward defendant," who is Tongan. (Maj. opn., *ante*, at p. 68.) But Towne's affidavit makes no mention of the shooter's race, and despite what the court "assume[s]" (*id.* at p. 67), we do not know what Towne would have said on this point if he had testified. It does not appear Towne identified the shooter's race at the scene. Nor did Fowler, who testified at trial that he could not determine the race of the person and had mistakenly told a defense investigator years later that the shooter was African American because he "assumed that person to be" based on the person's "silhouette . . . , the way the person was walking holding the gun." Rodriguez testified that while he described the shooter as Black at the scene, he could not tell what ethnicity the shooter was, see the shooter's face, or recall why he thought the person was Black. In sum, it is unlikely that whatever testimony Towne might have offered about the shooter's race would have appreciably diminished the significance of his testimony, corroborating Fowler's, about the shooter's size as a basis for lingering doubt.

Today's opinion says Towne's testimony would have "pale[d] in comparison to the evidence at the guilt phase . . . establishing defendant's guilt." (Maj. opn., *ante*, at p. 68.) However, a jury "may properly conclude that the prosecution has discharged its burden of proving defendant's guilt beyond a reasonable doubt but . . . may still demand a greater degree of certainty of guilt for the imposition of the death penalty." (*Terry*, *supra*, 61 Cal.2d at pp. 145–146.) The question is whether it is within reason that Towne's testimony may have prevented "absolute certainty" in the mind of one or more jurors and thereby "mitigate[d] against imposing the death penalty." (*Gonzalez v. Wong* (9th Cir. 2011) 667 F.3d 965, 993.) A juror entertaining "doubt, however slight" (*People v. Hamilton* (2009) 45 Cal.4th 863, 950), "which does not rise to reasonable doubt[,] can be expected to resist those who would impose the irremedial penalty of death" (*Smith v. Balkcom* (5th Cir. 1981) 660 F.2d 573, 581).

As noted, the prosecution's case at the guilt phase focused on the testimony of Carrillo and Masubayashi. Although the jury may have found their testimony credible beyond a reasonable doubt, their testimony was hardly so compelling as to foreclose any possible doubt about Mataele's role.

Carrillo, who faced special circumstance murder charges, gave an immunized statement about his involvement in the crime, naming Mataele as the shooter. He then pled guilty to reduced charges and a six-year sentence. Carrillo testified he would have done anything to get out of jail at the time of his statement, and the jury was instructed to view his testimony with caution. Fowler's eyewitness testimony described a shooter half the size of Mataele and wearing a cap, as Carrillo was wearing that night. And Shawn Monroe testified that Carrillo

5

asked him for help finding someone to provide fake identification documents because "[Carrillo] said he just shot some fools out in Orange County" and "need[ed] to leave town." Mataele testified that Carrillo was the shooter, and Allan Quiambao testified Carrillo admitted to the shooting in 2001.

Carrillo's testimony was also inconsistent with the prosecution's other evidence on key points. Carrillo said he was in the car with Masubayashi when Danell Johnson and Masubayashi were shot; Masubayashi said Carrillo got out of the vehicle before any shots were fired. Carrillo had blood on his clothes, inconsistent with forensic evidence that there was no blood spatter anywhere near where Carrillo alleged to have been sitting at the time of Johnson's death. All of the blood inside and outside of the vehicle was to the right of Johnson where the shooter would have stood.

Towne, on the other hand, was a disinterested eyewitness whose testimony may have been given more weight than Carrillo's. His testimony, combined with Fowler's, may have further drawn Carrillo's testimony into doubt.

As for Masubayashi, he was in the car with Johnson but was not looking in Johnson's direction when Johnson was shot. Masubayashi testified that he saw Mataele's forearm holding a gun pointing into the car after hearing the shot that killed Johnson. But Masubayashi did not see who was shooting at him as he took off across the parking lot, which is what Towne would have testified to. At the scene, Masubayashi told an officer who asked who shot him, " 'patch me up and I'll tell you.' " In the hospital, Masubayashi first maintained that he could not identify whether the shooter was Mataele, Carrillo, or someone from the neighboring car; he said he "d[id not] know who" shot

him "because [he] c[ouldn't] even see." Nor could Masubayashi identify the gun when he was first interviewed. He thought the shooter was Mataele because Mataele had a gun earlier that evening, and a week after the shooting, Masubayashi continued to name Mataele as the shooter. But he indicated he was still not sure because he could not see the shooter's face and the events occurred too quickly.

In these circumstances, it seems quite plausible that the jury could have credited aspects of Carrillo's and Masubayashi's testimony while still harboring some doubt about Mataele's role. Further, although the jury could have understood aspects of Quiambao's and Sia Her's testimony to suggest that Mataele was the shooter, their testimony was also not inconsistent with the defense's theory that while Mataele was present and carried a gun earlier that evening, Carrillo was the shooter. The jury requested readbacks of Quiambao's, Masubayashi's, Carrillo's, and Her's testimony, indicating they were "focused on defendant's role in the murder" and did not view this as an airtight case. (*Gay*, *supra*, 42 Cal.4th at p. 1227.) The prosecutor's argument in the penalty phase focused in large part on the circumstances of the crime, describing it as a "cold-blooded," "calculated murder" that warranted a death verdict. Admitting Towne's testimony at the penalty phase would have appreciably weakened the case in aggravation. In sum, although there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Mataele was the shooter, there is a reasonable possibility that had Towne's testimony been admitted, at least one juror would have "demand[ed] a greater degree of certainty of guilt for the imposition of the death penalty." (*Terry*, *supra*, 61 Cal.2d at pp. 145–146.)

Today's opinion also relies on the prosecution's other penalty phase evidence in finding the error harmless, but the evidence was hardly overwhelming. The prosecutor presented victim impact testimony from two of Johnson's cousins and Sia Her, who was Johnson's girlfriend at the time of the shooting. The prosecution also introduced evidence of three prior incidents that were not especially aggravated; indeed, the prosecutor told the jury in his penalty phase opening statement that these "may not be the most violent crimes you've heard about in your whole life." First, Deputy Sheriff Claude Waddle testified that Mataele, at age 13, admitted to exposing himself to and touching two classmates on the breast and buttocks. One of the victims testified that she "vaguely remember[ed]" Mataele exposing himself to her and did not remember him ever touching her. Second, Thomas Kinsey testified that when Mataele was 17 years old, four individuals confronted him (Kinsey) for his briefcase and asked him for money. Officer David Dooros testified that he observed Mataele push Kinsey and draw back his arm as if to punch Kinsey. Dooros broke up the scene and Kinsey was unharmed. Third, John Hagen testified that when Mataele was 19 years old, Mataele put a gun to his (Hagen's) head and took his wallet. Mataele pled to five years for armed robbery.

In total, the prosecution's penalty phase case-in-chief was comprised of eight witnesses, lasted less than a day, and took up fewer than 70 pages of the reporter's transcript. There was no rebuttal.

The defense's case in mitigation, by contrast, lasted seven days and included 32 witnesses. Numerous witnesses described generational violence, poor supervision and discipline, and Mataele's father's alcohol abuse. Relatives described how

8

Mataele and his mother were brutally beaten by his father for decades. Mataele tried to protect his mother and younger siblings from their father. Mataele also supported the family financially at times and helped care for a disabled family member, Cece, whom he loved like a daughter. In addition, family members, friends, teachers, and coaches described Mataele as smart, loving, artistic, respectful, and kind. Mataele organized weekly "family home meetings" to encourage the kids in the family to go to school and other family members to get a job, help one another, and stay out of trouble. Thirty to fifty family members would attend each week, and Mataele led the meetings. Witnesses described how Mataele's advice led them to positive lifestyle changes. Further, medical and correctional experts described Mataele's intelligence and ability to benefit from educational opportunities; reviewed his confinement records and reported no incidents involving drugs, weapons, or gang activity; and testified that Mataele would be a "good candidate to lead a productive, nonviolent life in prison." The trial court said it thought defense counsel was doing "a marvelous job in presenting a different picture of Mr. Mataele to this jury" and in bringing evidence "in front of the jury regarding a defendant's other personality . . . than . . . a coldblooded killer."

The penalty trial in this case was not an instance where the totality of the evidence portrayed the defendant as irredeemably depraved or dangerous. The jury was ultimately unpersuaded by the defense evidence of Mataele's background and character. But Towne's testimony would not have been cumulative of such evidence. Instead, it would have responded directly to the prosecution's reliance on the brutality of the murder by sowing doubt about Mataele's role. If Towne had

9

been allowed to testify at the penalty phase, it is reasonably possible that one or more jurors would have refrained from voting for death because of lingering doubt as to whether Mataele was the shooter, among other mitigating factors.

The court considers it "significant[]" that the defense's penalty phase argument focused "not on lingering doubt, but on defendant's family history, background and character, brain activity, and adjustment to prison as factors in mitigation." (Maj. opn., *ante*, at p. 69.) It contends that "defense counsel's failure to raise the issue even given Fowler's admitted testimony — which was essentially the same as Towne's excluded testimony — serves to further underscore the inconsequential nature of the error." (*Id.* at p. 70.) But it should come as no surprise that the defense did not make a lengthier lingering doubt argument when it was prohibited from presenting the most persuasive evidence it had of Mataele's innocence. As noted, Fowler's testimony on its own was of less persuasive value than Towne's testimony and Fowler's testimony would have been combined. Defense counsel plainly would have made more of lingering doubt had Towne's testimony been admitted. Indeed, in objecting to the prosecutor questioning Mataele about the shooting during Mataele's penalty phase testimony, defense counsel said, "We're not here to relitigate the whole guilt phase all over again. . . . If I wanted to relitigate some stuff, which I couldn't because I couldn't even put Towne on, well, then maybe it's a different story. I'd be reopening it. But I intentionally stayed away from relitigating the guilt issues part because I couldn't even present Mr. Towne to establish some sort of lingering doubt."

Even so, defense counsel did argue lingering doubt at some length during his penalty phase closing argument. He also

continued to urge the jury to question the credibility of Masubayashi and Carrillo, noting they were the "cornerstone" and "foundation" of the prosecution's case. And he reminded the jury that "just because we didn't repeat it during the penalty phase doesn't mean you are precluded from considering it during this second phase." It is clear that defense counsel wanted the jury to continue to consider evidence that Mataele was not the shooter. On this record, I see no basis for concluding that "defense counsel's failure to raise the issue . . . serves to further underscore the inconsequential nature of the error." (Maj. opn., *ante*, at p. 70.)

Finally, the trial court's instruction on lingering doubt does not tend to show that the exclusion of Towne's testimony was harmless. If anything, the fact that the prosecution did not oppose the instruction and the trial court agreed to issue it, despite recognizing its discretion not to do so, confirms that the defense theory of lingering doubt was in play. Because the exclusion of Towne's testimony reduced the value of the requested instruction to the defense, I cannot conclude that the error was harmless.

The standard of review here bears emphasis: The erroneous exclusion of Towne's testimony can be found harmless only if there is no reasonable possibility that absent the error, the balance of aggravating and mitigating factors, including lingering doubt, would have led one or more jurors to vote for life imprisonment without parole instead of death. Although my colleagues are confident there is no such possibility, I am not. Given the circumstances of this capital sentencing trial, it is hard to think of evidence more potentially consequential than eyewitness testimony identifying someone other than the defendant as the actual killer. It is reasonably possible that one

or more jurors would not have been certain beyond all possible doubt that Mataele was the shooter and, on that basis, would have refrained from voting for death.  Accordingly, I respectfully dissent from the penalty judgment while joining today's opinion affirming Mataele's convictions.

**LIU, J.**

**I Concur:**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Mataele

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S138052
**Date Filed:** July 21, 2022

_____

**Court:**  Superior
**County:**  Orange
**Judge:**  James A. Stotler

_____

**Counsel:**

Stephen M. Lathrop, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James William Bilderback II, Assistant Attorney General, Holly D. Wilkens, Annie Featherman Fraser, Kristen Kinnaird Chenelia and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen M. Lathrop
904 Silver Spur Road #430
Rolling Hills Estates, CA 90274
(310) 237-1000

Donald W. Ostertag
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9557